# Illinois Official Reports

## Appellate Court

---

**People v. Watson, 2021 IL App (1st) 180034**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRITANY WATSON, Defendant-Appellant. |
| District & No. | First District, Third Division<br>No. 1-18-0034 |
| Filed | September 29, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CR-162802; the Hon. James B. Linn, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Douglas R. Hoff, and Daniel H. Regenscheit, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Janet C. Mahoney, and David H. Iskowich, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE ELLIS delivered the judgment of the court, with opinion.<br>Justices McBride and Burke concurred in the judgment and opinion. |

# OPINION

¶ 1    We must determine here whether due process bars the State from convicting a juvenile of first degree murder, based on either a felony-murder or common-design accountability theory, when the juvenile did not kill or intend for a killing to occur. We hold that due process does not impose such a bar.

¶ 2                                        BACKGROUND

¶ 3    In December 2012, when she was 17, defendant Britany Watson began a pay-for-sex arrangement with Sherman Horton, age 38.

¶ 4    On the evening of December 17, 2012, Horton sat in his car with defendant near the intersection of Mayfield Avenue and Superior Street in Chicago, arguing about the terms of their encounter that evening. Essentially, defendant wanted Horton to pay in full upfront; Horton wanted an installment plan.

¶ 5    Unbeknownst to Horton, in the days leading up to December 17, defendant and a man named Lavell Blanchard (whom defendant knew as "Baby Mafia") were conspiring to rob him. Blanchard would do the dirty work; defendant just had to get Horton in place. So, as defendant and Horton sat in Horton's car, defendant texted Blanchard and asked, to use their vernacular, whether he wanted to "hit this lick? I got a lick for you." ("Lick," defendant explained, is slang for robbery; defendant was telling Blanchard that now would be a good time to rob Horton.)

¶ 6    Blanchard confirmed the plan and instructed defendant to stay in the car with Horton. Evidently, something aroused Horton's suspicions, because in the time between Blanchard's response and his eventual arrival at Horton's car, defendant texted Blanchard, telling him to "hurry" because Horton was "flogging," and she later added, "[d]ude tripping, come on."

¶ 7    Shortly thereafter, Blanchard and another man arrived at Horton's car. Blanchard, armed, approached the driver's side door, where Horton was sitting. His accomplice approached the passenger's side, holding a brick. Blanchard tapped his gun against the driver's side window, causing Horton to yell that he was being robbed; Horton started to move the car forward. Blanchard fired the gun through the window into the car, hitting Horton and spraying shattered glass on defendant in the passenger seat.

¶ 8    As defendant put it, Blanchard "got [Horton] good." After the shooting, Horton's car traveled for a short distance before crashing into a parked car. Blanchard then ran up to the car and ransacked Horton's pockets. At the same time, Blanchard told defendant to "play it off." Defendant ran into a nearby building, where she encountered some residents and pretended that she had just been the victim of a crime. Horton died from his injuries.

¶ 9    When the police arrived at the scene, neighbors directed the responding officer, Officer Magiera, to a nearby apartment. There, Officer Magiera found defendant hysterical and covered in blood. Defendant told Officer Magiera that she fled Horton's car after it crashed. She was then transported by ambulance to the hospital.

¶ 10   At the hospital, Chicago police Detective Anthony Green asked defendant what happened. Defendant became upset and said that Horton was not supposed to get shot. According to Detective Green, defendant then told the police that "she had set [the] robbery up." Defendant later gave a statement to police during custodial interrogation, admitting to planning the

robbery with Blanchard days in advance but claiming that she had expected Horton to give up the money immediately on Blanchard's demand, as opposed to the encounter ending in gunfire.

¶ 11 Defendant was convicted of multiple counts of first degree murder predicated on the doctrines of accountability and the felony-murder statute. In finding defendant guilty, the court observed that defendant and Blanchard

"were plainly setting up an old fashion trick robbery. By that I mean [defendant] was to lure a person into a place where he would be vulnerable, and work with somebody else who was going to come and, in her words, hit a lick, which I understand and I can basically take judicial notice that a lick means commit a robbery. Somebody who was going to come armed and when a person is vulnerable, not able to escape, compromised, and take advantage of the situation to get what they could."

¶ 12 The court continued:

"[T]his was a setup for a robbery, an armed robbery, that Mr. Blanchard came there with a gun. The gun was loaded. He was quick to use the gun before much of a robbery could be completed. That being said, this all happened in the course of their committing a felony crime together with a weapon that was used. Both of them were in it together. It was, again, premeditated. It was planned. They were complicit in each other's conduct."

¶ 13 The court merged defendant's convictions into a single conviction for felony murder and imposed a 25-year sentence. The court declined to impose a discretionary 15-year enhancement based on her age and the fact that she was not the shooter. This appeal followed.

¶ 14 ANALYSIS

¶ 15 Defendant raises constitutional claims as to both the felony-murder and accountability statutes. First, she argues that the same principles regarding juvenile accountability that underpinned the United States Supreme Court's eighth amendment jurisprudence in *Miller v. Alabama*, 567 U.S. 460 (2012), *Graham v. Florida*, 560 U.S. 48 (2010), and *Roper v. Simmons*, 543 U.S. 551 (2005), operate to bar the State, under the aegis of due process, from convicting any juvenile of murder based on the felony-murder or accountability doctrines if the juvenile did not commit or intend to commit murder. Second, defendant raises an as-applied challenge, arguing in terms that largely parrot her facial claim, that applying the felony-murder and accountability doctrines violated her right to substantive due process.

¶ 16 I

¶ 17 We begin with the as-applied challenges to the statutes, because if defendant cannot show that these statutes are unconstitutional as applied to her, she obviously cannot mount a facial challenge on the same ground. See *In re M.A.*, 2015 IL 118049, ¶ 39 (statute is facially invalid only if "no set of circumstances" exist under which statute would be valid).

¶ 18 As an initial matter, we question the factual premise of this challenge. Defendant claims that she did not intend for a killing to occur, but we have only her word for that from her statements to the police, where she claimed that Horton was "not supposed" to be shot and that she had anticipated a nonviolent ending to the encounter. The trial court did not make any finding as to defendant's intent because the court was not asked to do so—defendant did not

raise this due process challenge below. Nor did the offenses charged require the State to prove defendant's intent, much less require the court to opine on that question.

¶ 19 What little else we can say from the record is that the trial court expressly found that defendant planned an *armed* robbery, so it is not as if the possibility of gunfire was completely out of the question. We can haggle over whether there were hints here or there in the record as to defendant's intent, as both parties do. But the long and short is that defendant asks us to simply assume what she did or did not intend, without an evidentiary finding, and then to invalidate a conviction (and possibly a state law or two) based on that assumption.

¶ 20 If we found defendant's argument to be potentially meritorious, we would have to decline consideration of this issue for lack of an adequate record. See *People v. Harris*, 2018 IL 121932, ¶¶ 38-39. But for the reasons we discuss below, we do not find it meritorious, even if we accepted defendant's premise about her lack of intent, so there is no reason to delay resolution.

¶ 21 A

¶ 22 The constitution generally leaves choices about substantive criminal law—questions, for example, like what should be a crime and who can be held criminally liable—to the states. See *Clark v. Arizona*, 548 U.S. 735, 752 (2006). The reason is that criminal laws constantly evolve, shaped as they are by the public's ever-shifting moral, religious, philosophical, and medical views of social policy and moral culpability, as expressed through its elected legislators. See *Kahler v. Kansas*, 589 U.S. ___, ___, 140 S. Ct. 1021, 1028 (2020); *Powell v. Texas*, 392 U.S. 514, 536 (1968). Some states outlaw cannabis use, others do not; some impose abortion restrictions, others do not; states vary widely in the age at which and the offenses for which juveniles may be prosecuted as adults. Courts are reluctant to impose rigid, judicially imposed formulas in the name of due process, lest they interrupt that " 'constantly shifting adjustment.' " *Kahler*, 589 U.S. at ___, 140 S. Ct. at 1028 (quoting *Powell*, 392 U.S. at 536).

¶ 23 Instead, the Supreme Court has long held, the due process clause will invalidate a state criminal statute only if that law " 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' " *Id.* at ___, 140 S. Ct. at 1027 (quoting *Leland v. Oregon*, 343 U.S. 790, 798 (1952)). The ultimate question "is whether a rule of criminal responsibility is so old and venerable—so entrenched in the central values of our legal system—as to prevent a State from ever choosing another." *Id.* at ___, 140 S. Ct. at 1028. To answer that question, we look primarily to "historical practice," namely "eminent common-law authorities (Blackstone, Coke, Hale, and the like) as well as to early English and American judicial decisions." *Id.* at ___, 140 S. Ct. at 1027. Finding such authority to invalidate a criminal statute, "though not unheard of, is rare." *Id.* at ___, 140 S. Ct. at 1028.

¶ 24 Thus, said the Court, due process did not prevent the state of Arizona from eliminating the cognitive-incapacity prong of the traditional two-prong insanity defense (see *Clark*, 548 U.S. at 753), nor did it require Kansas to adopt the moral-incapacity prong of that test (see *Kahler*, 589 U.S. at ___, 140 S. Ct. at 1037). In each of those decisions, the Supreme Court declined to impose a rigid constitutional formula on laws passed by the states, as it could identify nothing so fixed and deeply rooted in our nation's history as to "tie a State's hands centuries later." *Id.* at ___, 140 S. Ct. at 1037; see *Clark*, 548 U.S. at 753 ("There being such fodder for reasonable debate about what the cognate legal and medical tests should be, due process imposes no single canonical formulation of legal insanity.").

¶ 25     Defendant has not cited, nor have we located, any authority establishing, as a matter of historical practice, that juveniles who neither killed nor intended to kill were exempted from first degree murder liability under either a felony-murder or accountability theory. She has come nowhere close to demonstrating a "principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." (Internal quotation marks omitted.) *Kahler*, 589 U.S. at ___, 140 S. Ct. at 1027.

¶ 26     Defendant's reliance on the Supreme Court's recent trio of juvenile sentencing decisions—*Roper*, *Graham*, and *Miller*—does not change this fact. We will have more to say about these cases later, but suffice it for now to note that these decisions most certainly did not purport to reflect principles of justice deeply rooted in our nation's history. Quite the opposite: eighth amendment jurisprudence considers "evolving standards of decency that mark the progress of a maturing society" (internal quotation marks omitted) (*Roper*, 543 U.S. at 561), not long-embedded, centuries-old principles. Indeed, *Roper* itself is just such an example; in that 2005 decision, the Court held that it was unconstitutional to execute juveniles, even though it had reached the opposite conclusion only 16 years earlier in *Stanford v. Kentucky*, 492 U.S. 361 (1989). See *Roper*, 543 U.S. at 556.

¶ 27     It is perhaps because of that poor fit that our supreme court has made clear that defendants cannot use eighth amendment case law to reconstitute the meaning of due process. See *People v. Patterson*, 2014 IL 115102, ¶ 97. There, a juvenile was charged with aggravated criminal sexual assault, and pursuant to the mandatory transfer provision of the Juvenile Court Act of 1987 (see 705 ILCS 405/5-130 (West 2008)), his case was automatically transferred from the jurisdiction of the juvenile court to adult criminal court, where he was convicted. *Patterson*, 2014 IL 115102, ¶ 5. The defendant argued on appeal that, based on the concerns about youth culpability articulated in *Roper*, *Graham*, and *Miller*, section 5-130 was facially unconstitutional under the due process clause. *Id.* ¶ 93.

¶ 28     Our supreme court firmly rejected this argument as being "crafted from incongruous components." *Id.* ¶ 97. The court explained that "the applicable constitutional standards differ considerably between due process and eighth amendment analyses," and "[a] ruling on a specific flavor of constitutional claim may not justify a similar ruling brought pursuant to another constitutional provision." *Id.* The court ended its analysis with the admonishment that "a constitutional challenge raised under one theory cannot be supported by decisional law based purely on another provision." *Id.*

¶ 29     So too here. Defendant has not shown an entrenched, deeply rooted principle of justice protecting juveniles from first degree murder liability when they neither killed nor intended to kill. She cannot demonstrate harm to a fundamental right or interest.

¶ 30                                              B

¶ 31     Defendant argues, however, that the felony-murder and accountability statutes fail muster even under the rational-basis test, the test typically employed by our courts to consider due process challenges when the right asserted is not a fundamental one. See *People v. Pepitone*, 2018 IL 122034, ¶ 14. It is not entirely clear to us that it is necessary to consider defendant's claim under the rational-basis test. After all, the United States Supreme Court in *Kahler*, *Clark*, and in that line of case law did not. After determining that the defendants in those cases could not identify an interest of justice deeply embedded in our nation's history as to qualify as fundamental, it ended its analysis without employing the rational-basis test or any other test;

the negative answer to that single question was dispositive. See *Kahler*, 589 U.S. at ___, 140 S. Ct. at 1037; *Clark*, 548 U.S. at 753.

¶ 32    In any event, defendant's claim fails under the rational-basis test. Under that considerably lenient standard, we must uphold a statute so long as it bears a rational relationship to a legitimate legislative purpose. *Pepitone*, 2018 IL 122034, ¶ 14; *Hayashi v. Illinois Department of Financial & Professional Regulation*, 2014 IL 116023, ¶ 29. The standard is not toothless but remains highly deferential to the findings and judgment of our legislature. *Pepitone*, 2018 IL 122034, ¶ 17.

¶ 33    As noted, defendant relies on the United States Supreme Court's recent trio of juvenile sentencing decisions arising under the eighth amendment—*Roper*, *Graham*, and *Miller*. Since she uses those cases in the same way to challenge both the felony-murder and accountability statutes as applied to her, we begin with a brief discussion of those cases.

¶ 34    *Roper*, 543 U.S. at 578-79, held that the eighth amendment barred the execution of juvenile offenders. *Graham*, 560 U.S. at 82, held that life sentences without the possibility of parole for juveniles convicted of nonhomicide crimes violated the eighth amendment. And *Miller*, 567 U.S. at 489, extended that constitutional ban to mandatory life sentences to juveniles convicted of homicide.

¶ 35    In *Miller*, 567 U.S. at 471, the Court explained that these decisions were based on "three significant gaps between juveniles and adults." First, "children have a ' "lack of maturity and an underdeveloped sense of responsibility," ' leading to recklessness, impulsivity, and heedless risk-taking." *Id.* (quoting *Roper*, 543 U.S. at 569). Second, juveniles " 'are more vulnerable … to negative influences and outside pressures,' including from their family and peers" and "have limited 'contro[l] over their own environment,' " which in turn negates their "ability to extricate themselves from horrific, crime-producing settings." *Id.* (quoting *Roper*, 543 U.S. at 569). Third, a juvenile's "character is not as 'well formed' as an adult's," and a juvenile's "traits are 'less fixed' and [their] actions less likely to be 'evidence of irretrievabl[e] deprav[ity].' " *Id.* (quoting *Roper*, 543 U.S. at 570). Elsewhere, the Court underscored that youth "is a time of immaturity, irresponsibility, 'impetuousness[,] and recklessness.' " *Id.* at 476 (quoting *Johnson v. Texas*, 509 U.S. 350, 368 (1993)).

¶ 36    At bottom, defendant's reliance on the *Roper*/*Graham*/*Miller* trilogy rests on the proposition that, in her words, "it is unreasonable to attribute the same capacity for foresight to a juvenile who takes part in a crime—even a dangerous felony—as the law presumes of a reasonable adult." Thus, she says, "[b]ecause it is unreasonable to presume a juvenile would know or foresee that death may result from their actions, the felony-murder and accountability-for-murder rule as applied to juveniles who neither kill nor intend to kill is discriminatory and not related to its intended purpose." She thus finds "no rational basis" for holding her "to the same level of culpability as an adult murderer."

¶ 37    One big problem with this argument will echo what we said above about the poor fit between eighth-amendment and due-process jurisprudence. It is one thing to recognize the differences between adults and children when considering *punishment* and conclude that we should not give up entirely on juveniles by executing them or locking them up and throwing away the key. It is quite another, however, to embrace defendant's position here that we should *absolve juveniles from liability completely* for the fatal consequences of their actions, by prohibiting states like Illinois from imposing liability via felony-murder and accountability

statutes. Sparing them from execution or mandatory life in prison is a far cry from giving them a complete pass on the resulting murder.

¶ 38    To that, we would add that defendant's argument does not track, in any event. She argues that juveniles like her, who did not intend to commit murder, are too immature to foresee the consequences of their actions. The problem with this argument is that the statutes she challenges do not require an intent to commit to murder, nor do they require that the resulting deaths be foreseeable.

¶ 39    Take first the felony-murder statute. The version in effect at the time, codified in section 9-1(a)(3) of the Criminal Code of 2012, provided in relevant part as follows: "[a] person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death," "he is attempting or committing a forcible felony other than second degree murder." 720 ILCS 5/9-1(a)(3) (West 2012).

¶ 40    The purpose of the felony-murder statute is to "deter persons from committing forcible felonies by holding them responsible for murder if a death results." *People v. Dennis*, 181 Ill. 2d 87, 105 (1998). It imposes "the broadest bounds for the attachment of criminal liability" (*id.*) and is unconcerned with whether the defendant intended to cause the death. Indeed, " '[a] defendant may be found guilty of felony murder regardless of a lack either of intent to commit murder [citation], or even connivance with a codefendant [citation].' " *People v. Klebanowski*, 221 Ill. 2d 538, 552 (2006) (quoting *Dennis*, 181 Ill. 2d at 105). The fact that a juvenile did not intend a death to occur, therefore, places the juvenile in no different a position than an adult who did not intend to cause death—the statute is not concerned with the defendant's intent to commit murder, only her intent to commit the underlying felony. Do not commit the underlying felony, in other words, because if something goes wrong and someone is killed, you will be liable for that death, whether you intended it or not.

¶ 41    We would say much the same thing about defendant's argument about foreseeability. However true it may be that juveniles lack a certain amount of foresight to appreciate the potential consequences of their actions, the felony-murder statute does not punish the wrongdoer based on what was or was not reasonably foreseeable.

¶ 42    That is to say, Illinois's felony-murder law is "premised on strict liability," and thus "[t]he State is not required to prove that the defendant could foresee the death or that the defendant intended to commit murder." *People v. Causey*, 341 Ill. App. 3d 759, 769 (2003); see also *People v. Brown*, 2015 IL App (1st) 131552, ¶ 32 ("To sustain a conviction for felony murder, the State need not prove the defendant contemplated 'that his actions would result specifically in death,' only that he or she intended to commit the underlying felony." (quoting *People v. Hudson*, 354 Ill. App. 3d 648, 655 (2004))); *People v. Bone*, 103 Ill. App. 3d 1066, 1068-69 (1982) ("For purposes of felony (armed robbery) murder, there is no requirement that the State prove a mental state element for the underlying offense. [Citation.] Thus, no mental state element as such need be proved to obtain the felony-murder conviction. [Citation.] The defendant is held strictly liable for felony-murder upon proof of the armed robbery.").

¶ 43    That fact is fatal to defendant's claim. There is nothing irrational or unreasonable about subjecting juveniles to felony-murder liability for deaths they could not foresee because the felony-murder law is unconcerned with the foreseeability of the resulting death.

¶ 44    That was a point well made in a nonbinding but persuasive (and from a factual standpoint, startlingly similar) decision of the Iowa Supreme Court in *State v. Harrison*, 914 N.W.2d 178 (Iowa 2018), cited here by the State. That case likewise involved a "lick" getting hit. *Id.* at 187.

The defendant, age 16 at the time of the offense, was convicted of first degree felony murder based on an aiding-and-abetting theory. At trial, the evidence suggested that the defendant's friend, Keith Collins, killed a drug dealer for money with a gun. Evidence from a recorded statement established that the defendant knew Collins was going to at least rob the drug dealer. Specifically, the defendant told his mother that Collins told him that he had a " 'lick' " that he " 'need[ed]' " because he had to " 'go to Chicago.' " *Id.*

¶ 45    On appeal, the defendant argued, among other things, that applying Iowa's felony-murder rule, as applied to juveniles based on an aiding-and-abetting theory, violated due process because "the felony-murder rule is premised on the assumption that juvenile offenders who participate in a forcible felony can appreciate the potential consequences of their participation," and "juvenile offenders are 'not developed enough to appreciate not only the assumption, but the natural consequence of the [forcible felony] (*i.e.* the murder).' " *Id.* at 191.

¶ 46    The Supreme Court of Iowa soundly rejected that argument. The court began by setting forth Iowa's felony-murder rule, which is substantially similar to Illinois's rule. See *id.* (" 'A person commits murder in the first degree when the person commits murder under any of the following circumstances… The person kills another person while participating in a forcible felony.' " (quoting Iowa Code § 707.2(1)(b) (2015))).

¶ 47    From that language, the court concluded that, to the extent the defendant's argument was "premised on the ability to foresee danger," it "mispresent[ed] the felony-murder rule" because "foreseeability is irrelevant to the felony-murder rule" and, though some deaths are obviously foreseeable, "the felony-murder rule encompasses unforeseeable crimes." *Id.* at 196. That is so, the court explained, because the felony-murder rule is premised on the notion "that there are certain felonies that 'are so inherently dangerous that proof of participating in these crimes may obviate the need for showing all of the elements normally required for first degree murder.' " *Id.* (quoting *State v. Heemstra*, 721 N.W.2d 549, 554 (Iowa 2006)).

¶ 48    We agree with that reasoning. While we appreciate the United States Supreme Court's observations that juveniles like defendant have a diminished capacity for foresight *vis-à-vis* their adult criminal counterparts, that feature of juvenility simply does not lead to the due process problem claimed by defendant because foreseeability is not an element in a traditional felony-murder prosecution like this one.

¶ 49    Nothing in *People v. Lowery*, 178 Ill. 2d 462 (1997), which discussed the so-called "proximate cause theory" of felony murder, requires a different result. Under the proximate cause theory, a defendant may be convicted of felony murder only if the State proves that the victim's death was a "direct and foreseeable consequence" of the defendant's actions. *Id.* at 467.

¶ 50    But *Lowery* concerned a scenario where the death was caused not by the defendant or one of his accomplices but, rather, by the robbery victim himself, who picked up defendant's gun after the robbery, shot at the defendant, and accidentally killed an innocent bystander. *Id.* at 464-65. It was only in that context that proximate cause, and thus foreseeability, entered the calculus:

> "In considering the applicability of the felony-murder rule *where the murder is committed by someone resisting the felony*, Illinois follows the 'proximate cause theory.' Under this theory, liability attaches under the felony-murder rule for any death proximately resulting from the unlawful activity—notwithstanding the fact that the killing was by one resisting the crime." (Emphasis added.) *Id.* at 465.

¶ 51    In other words, the State must prove foreseeability in a felony-murder prosecution only when "a third party outside of the criminal actors caused the death." *People v. Mandoline*, 2017 IL App (2d) 150511, ¶ 157; see also *People v. Hudson*, 222 Ill. 2d 392, 406-08 (2006) (co-felon killed by off-duty police officer; jury was properly instructed on reasonable foreseeability). Here, the person who killed Horton was Blanchard, defendant's co-offender, so the State was not required to prove that the defendant could have foreseen that Horton would get killed when she set up the robbery.

¶ 52    We thus reject the due process challenge to the felony-murder statute. In the traditional felony-murder context—*i.e.*, not one like *Lowery* involving death caused by a third party—the State does not punish felons based on whether they could or could not foresee a murder or intended it. The State punishes felons for intentionally committing the forcible felony that resulted in the death. So the particular attribute of juvenility that defendant identifies does not come into play. We find no basis for overcoming the strong presumption of constitutionality of the felony-murder statute.

¶ 53    We would say much the same of the accountability statute. Here, the State proceeded under the "common design" theory of accountability. Under that theory, our supreme court has explained, " 'where one aids another in the planning or commission of an offense, he is legally accountable for the conduct of the person he aids.' " *People v. Fernandez*, 2014 IL 115527, ¶ 21 (quoting *People v. Kessler*, 57 Ill. 2d 493, 497 (1974)); see 720 ILCS 5/5-2(c) (West 2012) (person is legally accountable for criminal conduct of another if, in furtherance of common criminal design, she "solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense"). And " 'the word "conduct" encompasses any criminal act done in furtherance of the planned and intended act.' " *Fernandez*, 2014 IL 115527, ¶ 21 (quoting *Kessler*, 57 Ill. 2d at 497).

¶ 54    It is irrelevant under the common-design theory, in other words, that the defendant did not intend to commit the murder; the only thing that matters is that the defendant intended to commit the underlying felony. See *id.* ¶ 16; *Kessler*, 57 Ill. 2d at 497. For example, in *Fernandez*, 2014 IL 115527, ¶¶ 17-18, when the defendant "entered into a plan to commit a burglary [of a parked car] with a companion he claims he did not know was armed," and the companion fired his gun in the direction of a responding police officer, the defendant was "legally accountable for *any criminal act* that Gonzalez committed in furtherance of the burglary, which in this case was the aggravated discharge of a firearm in the direction of a peace officer." (Emphasis in original.)

¶ 55    So again, defendant's complaint about holding juveniles liable for murders they do not intend to commit rings hollow, given that the common-design theory of accountability is unconcerned with the defendant's intent to murder.

¶ 56    And we say the same thing as to a juvenile's diminished capacity to foresee the fatal consequences of their crimes. Foreseeability is not an element of the common-design theory of accountability. Indeed, " 'the concept of reasonable foreseeability *** has no place in accountability analysis.' " (Internal quotation marks omitted.) *People v. Ivy*, 2015 IL App (1st) 130045, ¶ 35 (quoting *People v. Cooper*, 194 Ill. 2d 419, 426-27 (2000)). And again, if foreseeability is not a prerequisite to imposing liability under the common-design rule, then none of the Supreme Court's pronouncements about youth in *Roper*, *Graham*, and *Miller*, including their lack of foresight to appreciate the consequences of their acts, can ultimately have any bearing on a prosecution of a juvenile pursuant to that rule.

¶ 57 We thus reject the due-process challenges to the felony-murder and accountability statutes, as applied to defendant. And because these statutes do not violate due process as applied to defendant, her facial challenge to the statutes cannot stand, either. See *In re M.A.*, 2015 IL 118049, ¶ 39 (statute is facially invalid only if "no set of circumstances" exist under which statute would be valid).

¶ 58                                                            II

¶ 59 Last, we consider defendant's argument that her 25-year sentence was excessive. Reminiscent of the due-process claims we just rejected, defendant argues that "[g]iven that [she] neither killed nor intended to kill nor personally committed any act of violence, this is precisely the role in a crime that finds juvenile accountability and felony-murder sentencing wholly out of sync with a realistic understanding of juvenile brain development and reasoning capabilities."

¶ 60 The State says her argument is so far from a proper excessive-sentence claim as to be forfeited. We will consider it regardless but find it without merit.

¶ 61 The circuit court retains "great discretion" to "fashion an appropriate sentence within the statutory limits." *People v. Fern*, 189 Ill. 2d 48, 53 (1999). We will not find a sentence that is within the guidelines to be an abuse of that discretion unless it is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 210 (2000). Our role here is a modest one. The circuit court's sentencing decision is entitled to "substantial deference" because the circuit court, rather than a court of review operating on a cold record, "is in a much better position to consider factors such as the defendant's credibility, demeanor, moral character, mentality, environment, habits, and age." *People v. Snyder*, 2011 IL 111382, ¶ 36.

¶ 62 Here, defendant faced a sentencing range of 20 to 60 years, and the court had discretion to impose a 15-year enhancement, given that a firearm was used in the crime. When put in that context, defendant's claim that she is entitled to leniency—additional leniency, that is—falls far short. Her sentence was only five years above the minimum and was based, in part, on her post-event actions in trying to pretend to be a victim of the armed robbery, her deception with and hostility toward the police, and her conduct since jailed. The circuit court already displayed considerable leniency by declining to impose the firearm enhancement and choosing a sentence so close to the statutory minimum. We thus reject defendant's claim that her 25-year sentence was excessive.

¶ 63                                                     CONCLUSION

¶ 64 The judgment of the circuit court is affirmed.

¶ 65 Affirmed.