2024 IL App (1st) 230587-U

No. 1-23-0587

Order filed November 18, 2024

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 1511701 |
| | ) | |
| JESUS SUAREZ-MONTEZ, | ) | Honorable |
| | ) | Brian Flaherty, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE COBBS delivered the judgment of the court.
Justices Lavin and Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's conviction and sentence over his contention that the sentence was excessive.

¶ 2    Following a jury trial, defendant Jesus Suarez-Montez was found guilty on two counts of predatory criminal sexual assault of a child (PCSAC) (720 ILCS 5/11-1.40(a)(1) (West 2018)). The trial court imposed consecutive prison terms of nine years. On appeal, defendant contends the

sentence was excessive where the court did not "adequately consider" mitigating evidence indicating his rehabilitative potential. We affirm.

¶ 3    The State charged defendant by indictment with two counts of PCSAC, alleging that he knowingly made contact between his sex organ and that of the victim, K.L.E., on two occasions between April 1, 2019, and October 3, 2019, when he was over age 17 and K.L.E. was under age 13 (counts I and II). The State also charged defendant with aggravated battery (count III).

¶ 4    The report of proceedings reflects that prior to trial, the State extended a plea bargain to defendant whereby, in exchange for his guilty plea, he would be sentenced to eight years' imprisonment to be served at 85%. The record is unclear as to what offense defendant was to plead guilty. At a hearing, the trial court suggested the State "made a decision to at least amend or have [him] plead guilty to something else." At another hearing, the court suggested the guilty plea would "probably" apply to count III. After the court admonished defendant pursuant to *People v. Curry*, 178 Ill. 2d 509 (1997), he rejected the State's offer.

¶ 5    At trial, the State proceeded on counts I and II for PCSAC.[1]

¶ 6    K.L.E. testified that she was 12 years old at the time of the incidents at issue. In April 2019, she and her best friend, defendant's sister, attended a quinceañera and took photographs of each other, which were then uploaded to a social media website. The next day, K.L.E. received a message on her social media account from defendant. Over time, the messages defendant sent to K.L.E. changed into "sexual conversations."

---

[1] After the jury returned its verdict on counts I and II for PCSAC, the State advised the court that count III for aggravated battery was "nol-prossed."

¶ 7    At some point, defendant proposed that K.L.E. "sneak out" of her home at night and he would "pick [her] up." Eventually, K.L.E. agreed and snuck out of her home. Defendant arrived in a vehicle and took K.L.E. to his residence. While parked in his driveway, defendant told K.L.E. to go to the back seat of his vehicle where he joined her.

¶ 8    Defendant then removed some of K.L.E.'s clothes, including her underwear, and removed the bottom half of his clothing. Defendant then grabbed K.L.E.'s waist and "sat [her] on top of him." K.L.E. felt defendant's penis inside of her vagina. Defendant kept his hands on K.L.E.'s waist and began moving "[u]p and down" for "[a] couple minutes." Afterwards, they clothed themselves and returned to the front of the vehicle. Defendant then drove K.L.E. home.

¶ 9    Defendant continued messaging K.L.E. after the incident. Sometime later, defendant told K.L.E. he wanted to meet again. Defendant proposed a plan similar to the first. He drove to K.L.E.'s house, picked her up, and drove her to his residence.

¶ 10    K.L.E. and defendant then laid on his bed. Defendant removed some of K.L.E.'s clothes, including her underwear, and some of his clothes. Defendant inserted his penis inside her vagina and moved his body for a couple minutes. During the incident, he placed one of his hands around her neck and the other on top of her hand, making it hard to breathe and causing her to move. K.L.E. weighed less than 100 pounds. At some point, defendant stopped penetrating her. K.L.E. then clothed herself. Defendant told K.L.E. to cover up a "hickey" on her neck and not to tell her family. K.L.E. returned home that night.

¶ 11    At some point, K.L.E.'s father saw the "hickey" and confronted her. She told him about the incidents. Her father then took her to "talk to some lady" to tell "[t]he truth" about what

occurred. K.L.E. and defendant spoke "[a] couple times" before her father learned of the second incident.

¶ 12    On cross-examination, K.L.E. testified that she knew defendant's family prior to the incidents and visited his home many times.

¶ 13    Chicago Heights police detective Justin Boehl testified that on October 1, 2019, he met with K.L.E.'s father, who said that he observed a "hickey" on her neck and inappropriate messages on her phone. Thereafter, Boehl scheduled a forensic interview for K.L.E. Boehl observed the interview through a two-way mirror.[2]

¶ 14    After the forensic interview and a "TLO search" of K.L.E.'s cell phone, Boehl identified defendant as a suspect, arrested him, and took him to the police station. Boehl and a second detective interrogated defendant and recorded the interview, which was published to the jury. The recording is in the record on appeal and has been viewed by this court.

¶ 15    At the interrogation, defendant was advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and agreed to speak. He admitted he was 25 years old and thought K.L.E. was 13 years old. He admitted he "had sex" with K.L.E. at his home and said he was "dating" her at the time. He described her as "mature," but acknowledged their age difference "doesn't look good."

¶ 16    On cross-examination, Boehl testified that a rape kit was sent to a crime lab and returned with a report.

---

[2] K.L.E.'s forensic interview was recorded and provided in the record on appeal, but it was not published to the jury.

¶ 17 The jury found defendant guilty on both counts of PCSAC. Defendant's motion for a finding of not guilty or, in the alternative, a new trial was denied.

¶ 18 According to a presentence investigation report (PSI), defendant was arrested in 2012 and on probation for a residential burglary at the time of both incidents with K.L.E. He had a child, but did not pay child support. He reported having a good upbringing and maintained positive relationships with his parents, younger siblings, and girlfriend, all of whom had supported him throughout "this process." He reported that he did not take pride in committing crimes and, prior to incarceration, had been employed since 2016. He dropped out of high school in 12th grade to help his family. When asked for his version of the incidents, he said " ' they did not present evidence to convict me. ' "

¶ 19 At the sentencing hearing, victim impact statements from K.L.E. and her mother were read into the record. The court stated that it reviewed the PSI along with multiple letters in support of defendant. The letters, written by soccer players whom defendant coached, are not in the record on appeal.

¶ 20 In her victim impact statement, K.L.E. wrote that in the years after the incident, she "had a really hard time trying to cope." She suffered "a really bad state of depression," became "rude" to others, and shut "everyone out." She grew "angry at [herself] and *** the world because [she] wasn't sure how to deal with what [she] was feeling." As a coping mechanism, she harmed herself, and when "that wasn't enough," she developed suicidal ideations and planned to "overdose as a way to end [her] life." She felt "disgusted" and "angry," and "couldn't live with [herself]." She was "slowly trying to get back to how [she] was" before the incident, when she "used [to] be really happy."

¶ 21    K.L.E.'s mother wrote that prior to the incident, K.L.E. was "cheerful," "happy," and "talkative" but after the incident, their "lives changed completely." K.L.E.'s mother felt she "had not done [her] job *** as a mother," and there was "no remedy" to K.L.E.'s pain, describing it as the "saddest despair and derision" that "completely changed" K.L.E.'s personality. Helping K.L.E. be "a little bit of what she was" had been "long" and involved counseling from two mental health professionals.

¶ 22    In aggravation, the State argued that defendant groomed K.L.E. "to sneak out of her house and *** have sex with him" on two occasions, one involving force. The State noted that at the time of the incidents, defendant was on probation. The State did not recommend a sentence, but did "not believe" defendant deserved the minimum of six years for each count.

¶ 23    In mitigation, defense counsel argued that no weapons or drugs were used in either incident and defendant worked for four years and coached soccer for five years. According to counsel, the letters written in defendant's support described him as "a good person" who was "there to help" his soccer team "when they needed to eat" and who gave his players "money when they needed it." Those actions made the players "better people" who wanted "to do something productive with their lives." Counsel also noted defendant's familial support and participation in a GED program during his pre-trial incarceration. Counsel requested the minimum of six years for each count of PCSAC.

¶ 24    Defendant declined to speak in allocution.

¶ 25    The trial court noted it considered "all the factors in aggravation and mitigation" including the PSI, the victim impact statements, and the letters in support of defendant. The court noted that defendant was "on my probation when he committed this crime," which indicated that "maybe

[defendant] do[es] take pride in criminal behavior." The court stated that "the weakest person you can pick on is a child," noting that "[t]hey're gullible, they believe things that people tell them, and that's the person that [defendant] chose to commit these sexual acts" against. The court also noted that defendant "grew up in a loving home," and "things started to turn bad" after he was placed on probation. The court sentenced defendant to consecutive prison terms of nine years on each count of PCSAC.

¶ 26    Defense counsel's oral motion to reconsider sentence was denied.

¶ 27    On appeal, defendant argues that the trial court did not "adequately consider" mitigating evidence and his rehabilitative potential. In support, he points to his steady employment, "minimal criminal history," financial support for his family, and time as a soccer coach. He also contends the sentence was excessive given the State's pre-trial offer of eight years' imprisonment and its decision to not recommend a sentence.

¶ 28    Under the Illinois Constitution, "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. To achieve this goal, a trial court must balance retribution and rehabilitation by considering all factors in aggravation and mitigation, including a defendant's age, criminal history, moral character, education, habits, and the "nature and circumstances" of his crime, including his conduct during its commission. *People v. Hearring*, 2022 IL App (1st) 192064, ¶ 44; *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002).

¶ 29    PCSAC is a Class X felony with a sentencing range between 6 and 60 years. 720 ILCS 5/11-1.40(b)(1) (West 2018). If a trial court imposes a sentence within the statutory range for an offense, we review for abuse of discretion. *People v. Burnette*, 325 Ill. App. 3d 792, 807 (2001);

see also *People v. Bruce*, 2022 IL App (1st) 210811, ¶ 24. An abuse of discretion will be found only if the sentence is " ' greatly at variance with the spirit and purpose of the law, or manifestly disproportionate ' " to the offense. *People v. Watson*, 2021 IL App (1st) 180034, ¶ 61 (quoting *People v. Stacey*, 193 Ill. 2d 203, 210 (2000)). A trial court does not need to specify each reason or assign weight to the factors it considered in determining a sentence. *People v. Williams*, 2017 IL App (1st) 150795, ¶ 44. We must presume a trial court considered all relevant factors unless there is explicit evidence in the record that the court considered improper aggravating evidence or failed to consider mitigating evidence. *People v. Streater*, 2023 IL App (1st) 220640, ¶ 73. The most important factor is the seriousness of the crime. *People v. Wyma*, 2020 IL App (1st) 170786, ¶ 93. Evidence regarding a defendant's rehabilitative potential "is not entitled to greater weight than the seriousness of the offense" for purposes of sentencing. (Internal quotation marks omitted.) *People v. Elliot*, 2022 IL App (1st) 192294, ¶ 58. Ultimately, we may not substitute the judgment of a trial court with our own simply because we may have concluded differently. *People v. Cornejo*, 2020 IL App (1st) 180199, ¶ 137.

¶ 30    As a preliminary matter, the State argues that defendant waived his right to challenge the sentence on appeal because he did not submit a written motion to reconsider the sentence. See *People v. Harvey*, 2018 IL 122325, ¶ 15 (a defendant must contemporaneously object to his sentence and file a written postsentencing motion to preserve the issue for appeal). However, where, as here, the State does not object to a defendant's oral motion to reconsider the sentence, we may consider the issues raised despite the absence of a written motion. *People v. Rubio*, 2023 IL App (1st) 211078, ¶ 13.

¶ 31    Notwithstanding, the trial court did not abuse its discretion when it imposed an aggregate 18-year sentence. Considering the sentencing range for PCSAC as charged is between 6 and 60 years (720 ILCS 5/11-1.40(b)(1) (West 2018)), a 9-year sentence for each count does not even come close to being either " ' at variance with the spirit and purpose of the law, or manifestly disproportionate ' " to the offense. *Watson*, 2021 IL App (1st) 180034, ¶ 61 (quoting *Stacey*, 193 Ill. 2d at 210). Defendant, then age 25, initiated sexual conversations with a child he knew was over a decade younger than him, executed a plan to be alone with her, and sexually assaulted her on more than one occasion. The seriousness of the offense is the most important factor in sentencing. *Wyma*, 2020 IL App (1st) 170786, ¶ 93. Here, defendant understood the gravity of his actions, as evidenced by his statement during his interrogation that the age difference between he and K.L.E. "d[idn]'t look good" and his demand to K.L.E. to cover the "hickey" on her neck after the second incident.

¶ 32    Notably, defendant has not identified any statement from the trial court to substantiate his claim that it did not "adequately consider" mitigating evidence. We presume the court considered all relevant factors unless there is explicit evidence that it did not consider mitigating evidence or considered improper aggravating evidence. *Streater*, 2023 IL App (1st) 220640, ¶ 73. On this record, it is clear that the court considered "all the factors in aggravation and mitigation," including the PSI, which contained information on defendant's familial support, work history, and minimal criminal history. The court noted that it reviewed the "nice things" defendant's players wrote about him in their letters. The court also heard argument from defense counsel at the sentencing hearing. The court was under no obligation to specifically note and assign weight to each mitigating factor it considered when imposing the sentence. *Williams*, 2017 IL App (1st) 150795, ¶ 44. However,

the report of proceedings reflects that the court considered mitigating evidence along with significant aggravating evidence. Defendant essentially asks us to reconsider his mitigating evidence and grant it the weight he believes it is entitled. We may not do so. *Cornejo*, 2020 IL App (1st) 180199, ¶ 137.

¶ 33    Defendant also argues that the "significant disparity" between the State's 8-year plea offer and its decision to not recommend a sentence, and his ultimate 18-year sentence, indicated that the trial court abused its discretion.

¶ 34    Initially, we note that the record is unclear regarding whether the State's pre-trial offer applied to one of defendant's PCSAC counts or a different charge altogether. Further, although the State did not suggest a sentence for PCSAC, it did "not believe *** [defendant] deserve[d] the minimum" of six years for each count. In any case, defendant's argument is wholly without merit. Although the trial court's sentence might have exceeded the State's offer, the sentence imposed was well within the statutory range and significantly below the maximum. "[W]hat the State may have offered defendant during plea negotiations *is irrelevant*" as long as the ultimate sentence imposed by the court was not a penalty for defendant's constitutional right to proceed to trial. (Emphasis original.) *People v. Schnoor*, 2019 IL App (4th) 170571, ¶ 93. Neither, by the way, would the court have been bound by any sentencing recommendation, had one been offered by the State. See *People v. Means*, 2017 IL App (1st) 142613, ¶ 16; see also *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 109. The court, having first considered the post-sentencing investigation report, the seriousness of the offense, the victim impact statements and the mitigating and aggravating factors, sentenced defendant as it deemed appropriate. We cannot say that the sentence is at variance with the spirit and purpose of the law.

¶ 35    Accordingly, we hold that the trial court did not abuse its discretion when it imposed an aggregate 18-year sentence. The judgment of the trial court is affirmed.

¶ 36    Affirmed.