NOTICE

Decision filed 04/20/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 230287-U

NO. 5-23-0287

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Vermilion County. |
| | ) | |
| v. | ) | No. 21-CF-675 |
| | ) | |
| DUSTIN COOPER, | ) | Honorable |
| | ) | Derek J. Girton, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CLARKE* delivered the judgment of the court.
Justices Barberis and Hackett** concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The defendant's convictions and sentence are affirmed. We find that the defendant is not entitled to reversal, or to reversal with remand for new trial, because (1) it was not an abuse of discretion to transfer the defendant to adult criminal court, (2) the denial of the defendant's *Batson* challenge was not clearly erroneous, (3) there was sufficient evidence presented at trial to support the defendant's conviction of felony murder and the conviction under the statute in effect at the time was not unconstitutional, and (4) the defendant's sentence was not unconstitutional as applied to him under the eighth amendment and the factual record is insufficiently developed to address his as-applied proportionate penalties clause claim.

¶ 2    Following a jury trial, the defendant, Dustin Cooper, was found guilty of two counts of

first degree murder (720 ILCS 5/9-1(1), (3) (West 2018)) involving the deaths of 19-year-old

_____

*Justice Moore was originally assigned to the panel before his retirement. Justice Clarke was substituted on the panel and has read the briefs and listened to oral argument.
**Justice Welch was originally assigned to the panel prior to his death. Justice Hackett was substituted on the panel and has read the briefs and listened to oral argument.

1

Wyatt Bailey and 16-year-old Clayvonte Sloan and one count of armed robbery (*id.* § 18-2(a)(2)). The defendant was 15 years old at the time of the offense. By agreement of the parties, the trial court merged any remaining alternative counts of first degree murder and the armed robbery count into the two counts of first degree murder. The trial court sentenced the defendant on the murder convictions to consecutive terms of 20 years' imprisonment for the first degree murder of Clayvonte Sloan (count IV) and 20 years' imprisonment for the first degree murder of Wyatt Bailey (count V) for an aggregate sentence of 40 years. This direct appeal follows.

¶ 3 On appeal, the defendant challenges (1) the discretionary transfer to adult court, (2) the denial of his *Batson* challenge, (3) the sufficiency of the evidence supporting the felony-murder convictions and the constitutionality of the felony-murder statute as applied to him, and (4) his sentence under the eighth amendment and the proportionate penalties clause of the Illinois Constitution. For the reasons that follow, we affirm the defendant's convictions and sentence.

¶ 4                                    I. BACKGROUND

¶ 5 On January 19, 2021, the State filed a petition for adjudication of wardship, alleging that the defendant, then 15 years old, had committed multiple counts of first degree murder related to the deaths of Clayvonte Sloan (the defendant's cousin) and Wyatt Bailey, one count of armed robbery, one count of robbery, and one count of mob action. The charges stem from an incident that occurred on January 17, 2021, during which the defendant and several other teenagers—Sloan, Ali Bryant, Jaevin Griggs, and Camarion Halthon—arranged to meet Bailey outside Bailey's residence to purchase cannabis. An altercation occurred during the encounter in which multiple gunshots were fired, resulting in both Sloan and Wyatt being fatally shot and subsequently dying. Following a detention hearing, the defendant was ordered to be placed in the temporary custody of the Vermilion County Juvenile Detention Center. On February 2, 2021, the State filed a motion

2

to transfer the defendant to adult criminal court under section 5-805(3) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/5-805(3) (West 2018)) and permit prosecution under the criminal laws, alleging the defendant planned an armed robbery, carried a firearm, and was a principal actor in a shooting that resulted in two deaths.

¶ 6                                 A. Transfer Hearing

¶ 7     On July 27, 2021, the juvenile court held a hearing on the State's motion to transfer. At the discretionary transfer hearing, the State first presented testimony from Sergeant Dustin Heckerson of the Vermilion County Sheriff's Department regarding the investigation into the January 17, 2021 shooting. Heckerson testified that he reviewed surveillance footage from a residence at the intersection of Covert and Wayne Drive in Oakwood, Illinois, near Bailey's residence. The residence had two cameras, which were both motion activated. Heckerson stated the videos depicted events that occurred before and after the incident, but the shooting itself was not captured. The videos showed a gold Chevrolet Impala circling the block several times before the incident, then later fleeing north on Wayne Drive with its rear passenger door open. The gold Impala stopped at a dead end on Covert Drive for a few seconds and then turned around and sped back in the direction that it came. Heckerson also interviewed several witnesses. Brendan Cunningham and Adriana Bloomfield, who were inside Bailey's residence, reported that Bailey stepped outside shortly before gunshots were heard; Cunningham then ran outside and found Bailey lying on the ground with a gunshot wound while a gold vehicle drove away. Bloomfield stated that Wyatt had been in contact with the defendant on Snapchat about purchasing "drugs." Other witnesses reported hearing gunshots and seeing the same gold Impala near a nearby dead end and observed "the front passenger window roll down and a subject with a black arm throw[ ] a pistol into the woods." A handgun was later recovered from that same area. Heckerson further testified that the

driver of the gold Impala, Bryant, later provided a statement indicating that he drove the defendant, Sloan, Griggs, and Halthon to Oakwood for a planned drug transaction with Bailey. According to Bryant's account, once they arrived, the defendant exited the vehicle and approached the residence. Bailey then approached the vehicle and a struggle occurred between Bailey and Griggs over a "drawstring bag." According to Bryant, he observed a black handgun in the waistband of Bailey during the struggle, and Sloan reached for the handgun in Bailey's waistband. During the struggle, the defendant approached from behind and struck Bailey in the back of the head with a handgun. According to Bryant, Sloan was shot by Bailey while Bailey was simultaneously shot by Griggs. After the shootings, the group fled the scene, discarding a firearm out of the vehicle at the dead end before being stopped by police.

¶ 8    The State next called Michael Hartshorn, chief investigator for the Vermilion County State's Attorney's Office, who testified regarding the evidence recovered during the investigation. Hartshorn testified that he responded to the location where deputies had stopped a gold Chevrolet Impala matching the suspect vehicle. He observed the vehicle contained scattered currency, clothing, and blood-like substances in the rear seat. Inside the vehicle were five individuals, including the defendant seated in the rear passenger seat, Griggs located in the rear, directly behind the driver, and Sloan seated between them. Halthon was in the front passenger seat. Sloan was unresponsive when officers discovered him and was transported to a hospital, where he later died from gunshot wounds. Hartshorn was informed by other deputies that the occupants stated they had gone to Oakwood to purchase marijuana. Hartshorn also testified that officers recovered two firearms from the back seat area of the vehicle—a .40 caliber Glock with an extended magazine, believed to belong to Bailey, and a 9-millimeter Polymer 80 handgun. Hartshorn further testified that another witness, Jonathan Ventura, reported seeing the Impala drive through the neighborhood

4

multiple times before hearing gunshots and observing the vehicle flee. Hartshorn also reviewed preliminary autopsy findings indicating Bailey died from multiple gunshot wounds, including a close-range gunshot wound to the chest, while Sloan died from a gunshot wound to the abdomen.

¶ 9　Investigator Arik Bruens of the Vermilion County Sheriff's Department testified regarding his role in the investigation of the shooting. Bruens stated that he interviewed Halthon, one of the occupants of the gold Chevrolet Impala, who reported that he and driver Bryant were contacted by the defendant and agreed to drive to Oakwood so the defendant could purchase marijuana from Bailey. According to Halthon, when the group arrived at Bailey's residence, the defendant attempted to complete the purchase, but Bailey produced a firearm and attempted to rob them. Halthon stated that Bailey grabbed the defendant and pulled him from the vehicle, leading to a struggle involving the defendant, Bailey, and Bryant. Halthon reported that Bryant exited the vehicle during the altercation and, at one point, body-slammed Bailey to the ground while attempting to take the firearm from him. During the struggle, gunshots were fired, resulting in Sloan being shot and Bailey also being shot. The group then reentered the vehicle and fled the scene before being stopped by law enforcement. Bruens further testified that digital evidence showed Snapchat communications between the defendant and Bailey arranging the meeting at Bailey's residence for a drug transaction, during which the defendant indicated he intended to spend approximately $150 on marijuana and $150 on "carts." Bruens also testified that investigators recovered photos and videos from phones showing individuals in possession of firearms connected to the incident and that counterfeit currency was later found inside the suspect vehicle.

¶ 10　At this stage of the transfer hearing, the State rested its case and presented no additional witnesses. The State requested the juvenile court to take judicial notice of the juvenile case file,

including prior court reports, the social history investigation report, the detention center information, and the juvenile's positive marijuana test at admission. Defense counsel did not object. The juvenile court admitted those materials for purposes of the hearing and also indicated it would consider additional reports filed later in the case, including the psychological evaluation completed by Dr. Michelle Hoy-Watkins and filed on June 28, 2021, and more recent court reports. The defense did not present any evidence on the issue of probable cause, and the juvenile court proceeded to argument. After considering the testimony, exhibits, and arguments of counsel, the juvenile court found that the State had established probable cause that the defendant committed the charged offenses. The juvenile court noted evidence that the defendant communicated with Bailey to arrange the meeting and was personally involved in the altercation with Bailey. The juvenile court further explained the law of accountability and concluded that there was sufficient evidence that the defendant participated in both the planning and the commission of the offenses.

¶ 11    After a short recess, the juvenile court proceeded to the second portion of the transfer hearing to determine whether it was in the best interests of the public to proceed under the Act or prosecute the defendant as an adult. The State argued that it was in the public's best interests for the defendant to be prosecuted as an adult and began presenting exhibits relevant to the statutory transfer factors. The juvenile court admitted, without objection, People's Exhibit A, the defendant's birth certificate, and People's Exhibits B and C, social history reports from the defendant's prior juvenile case and the present case. The State also introduced People's Exhibit D, a police report from the defendant's earlier juvenile case describing an April 15, 2020, incident in which the defendant fled from police and admitted dropping a stolen 9-millimeter handgun; officers also recovered approximately 313 grams of cannabis, and the incident involved Clayvonte Sloan and Jaevin Griggs, individuals the defendant had previously been ordered not to contact.

6

¶ 12    The juvenile court further admitted People's Exhibit E, the defendant's school records, and People's Exhibit F, a psychological evaluation prepared by Dr. Michelle Hoy-Watkins. With respect to the circumstances of the offense, the State asked the court to take judicial notice of the testimony presented during the probable cause portion of the hearing, which the court agreed to consider. The State then introduced People's Exhibit G, materials describing programs available through the Illinois Department of Juvenile Justice (IDJJ), and People's Exhibit H, a juvenile detention center court report.

¶ 13    The State called Tina Quick, a juvenile probation officer, who testified that she had supervised the defendant beginning in July 2020 in connection with a prior juvenile matter. Quick explained that the defendant had been placed on supervision and that her contact with him was somewhat limited due to COVID-19 pandemic restrictions. She testified that she was unaware of any abuse or neglect concerns involving the defendant based on her discussion with him and his mother. She further testified that the defendant had admitted to marijuana use during that period, but he was not recommended for treatment. She testified that he tested positive for marijuana when admitted to the juvenile detention center in both the earlier juvenile case and the present case. Lastly, she testified that the IDJJ provides services, such as schooling and counseling, for committed juveniles.

¶ 14    Eliza Brooks, principal of North Ridge Middle School, testified on behalf of the defense. Brooks testified the defendant attended the school during seventh and eighth grade and was generally a good student who earned good grades, though he struggled in one class due to a conflict with a teacher. Brooks stated she interacted with him frequently because he often came to her office to talk about school and personal issues. She described the defendant as intelligent, respectful, and able to be calmed and reasoned with when upset. Brooks testified that the defendant

7

was affected by his father's incarceration and appeared to struggle with the absence of a male role model, although he had a good relationship with his mother. She also observed him associating with older students, particularly Jaevin Griggs, whom she believed had a negative influence on him. Brooks was aware of an April 2020 incident in which the defendant reportedly ran from police while in possession of a firearm and recalled one incident where he brought marijuana to school. Despite those issues, Brooks believed the defendant had strong academic potential and would benefit from counseling and supportive services.

¶ 15    Breya McGrown, the defendant's mother, testified that his father was incarcerated for much of the defendant's life. His father briefly returned when he was young before later receiving an 18-year sentence when the defendant was about 12 or 13, which she said deeply affected him. She described additional trauma in the defendant's life, including the 2019 murder of a family friend who acted as a father figure and the death of the defendant's cousin, Clayvonte Sloan, in the incident underlying the case. McGrown testified that the defendant struggled emotionally afterward, experiencing nightmares, sleep problems, and loss of appetite. She also stated that the defendant lacked consistent male role models and that Jaevin Griggs was a negative influence on the defendant. On the day of the incident, she believed the defendant had simply gone out briefly with friends to ride around and go to Lincoln Park.

¶ 16    Robert Vickery, deputy director of programs for the IDJJ, testified about services available in the juvenile system. He explained that committed youth undergo assessments for education, mental health, trauma, and substance use, after which individualized treatment plans are developed. IDJJ provides schooling, counseling, trauma-focused programming, substance-abuse treatment, vocational training, and reentry planning. Vickery testified that juveniles committed for first degree murder must remain in DJJ for at least five years or until age 21 and stated that

8

adolescents often mature significantly during that time and can benefit from the rehabilitative services available in the juvenile system.

¶ 17 The psychological evaluation prepared by Dr. Michelle Hoy-Watkins for the purposes of the transfer hearing and admitted into evidence described the defendant's personal history, including the repeated incarceration of his father and the instability that resulted. The evaluation also noted that the defendant had previously been the victim of gun violence on multiple occasions during his childhood and adolescence. Dr. Hoy-Watkins concluded that the defendant displayed characteristics associated with childhood trauma and was particularly susceptible to influence from peers. She opined that the defendant would benefit from a structured environment providing trauma-informed mental health treatment, education, and vocational programming and indicated that rehabilitative services within the juvenile system could promote the defendant's development before the expiration of juvenile court jurisdiction.

¶ 18 At the conclusion of the hearing, the juvenile court ordered the parties to submit final arguments in writing. On August 25, 2021, the State filed its written argument with the juvenile court. Therein, the State argued that the seriousness of the offense and the defendant's prior delinquent history outweighed the benefits of juvenile treatment. The defendant previously had a 2020 case involving possession of cannabis and a firearm, during which he was placed on court supervision with conditions prohibiting drug use, weapon possession, and contact with the very individuals related to the present case. The State contended that the defendant violated these conditions and orchestrated the underlying incident, arranging a marijuana transaction with Wyatt Bailey, coordinating the trip to Bailey's residence, and participating in a violent confrontation that involved firearms and resulted in the deaths of Bailey and Clayvonte Sloan. The State emphasized that the defendant's active role, including "scouting" the location by driving around the residence

9

several times, exiting the vehicle and later striking the victim from behind with a handgun, and engaging in a struggle over a gun or drugs, demonstrated planning and dangerous conduct, and that his prior noncompliance and continued behavioral issues indicated he would not benefit sufficiently from juvenile programming.

¶ 19    On September 20, 2021, the defendant filed his response arguing that he should remain in juvenile court due to his youth, personal background, and rehabilitative potential. At 15 years old, the defendant was developmentally immature and highly susceptible to peer influence. He experienced significant instability, including a father repeatedly incarcerated, exposure to community violence, and untreated trauma and mental health issues. He argued he had minimal prior juvenile involvement and had not previously received mental health, substance abuse, or rehabilitative services. He further argued that the psychological evaluation indicated depression, anxiety, and trauma, while school and detention staff described him as respectful and capable of functioning in structured environments. In addition, he contended that the offense arose from a marijuana transaction, not premeditated robbery or homicide, and that juvenile placement would allow access to structured treatment, education, and supervision through age 21, providing meaningful rehabilitative opportunities.

¶ 20    On October 1, 2021, the State, in its reply, maintained that the defendant met the statutory criteria for discretionary transfer. His age did not preclude adult prosecution, as Illinois law allows minors as young as 13 to be transferred for murder. The State emphasized the defendant's role as the primary aggressor, orchestrating the transaction, initiating the confrontation, and engaging in violent conduct. His prior offenses, repeated violations of court orders, and refusal to participate meaningfully in services demonstrated a pattern of delinquency and a risk to public safety. While the defense relied on psychological evaluations to argue for rehabilitation, the State noted that the

defendant's noncompliance and escalating behavioral issues indicated juvenile supervision alone would not mitigate the danger to the community. The State concluded that adult prosecution was warranted.

¶ 21 On November 15, 2021, the juvenile court held a status hearing on the State's motion to transfer the defendant for prosecution under the criminal laws of Illinois. The juvenile court reviewed evidence and arguments concerning the defendant's age, prior history, circumstances of the offense, mental and educational background, and potential for rehabilitation. The juvenile court found that the defendant had turned 15 at the time of the offenses and had prior delinquent history, including a 2020 drug and firearm related case, for which he was on supervision and had violated court ordered restrictions. The juvenile court noted the defendant's prior exposure to trauma, his use of marijuana, and prior encounters with law enforcement, but found no evidence of developmental disabilities or mental health conditions that caused the offenses. As to the circumstances of the offense, the juvenile court found that the defendant was the primary planner of a drug transaction that escalated to an armed robbery and resulted in the deaths of Wyatt Bailey and Clayvonte Sloan. The defendant coordinated the transaction, approached the victim from behind, used a firearm to strike Bailey, and actively participated in the violent confrontation. The juvenile court found that the defendant's conduct demonstrated leadership and planning, not mere peer influence. The juvenile court balanced the statutory factors, including the seriousness of the offense, prior record, potential for rehabilitation, and public safety. It concluded that public safety required prosecution under adult criminal law where the defendant's prior record, unwillingness to comply with supervision and school directives, and the seriousness of the offense would inadequately address the severity of his conduct and juvenile programming alone was insufficient to mitigate risk. The juvenile court therefore granted the State's motion, allowing prosecution

11

under the criminal laws, and dismissed the petition for adjudication of wardship to the extent that criminal proceedings were initiated. The defendant was scheduled for bond court the following day.

¶ 22 On November 16, 2021, the defendant was charged in adult criminal court by information, which was later amended and then subsequently superseded by a bill of indictment on December 3, 2021, with a total of 10 counts. Counts I-IV charged the defendant as a principal and under a theory of accountability for first degree murder (720 ILCS 5/9-1(a)(1), (2), (3) (West 2020)), based on alternate theories, related to the death of Clayvonte Sloan. Counts I-III included language alleging a firearm enhancement, in that the defendant personally discharged a firearm that caused the death of Sloan, or was armed with a firearm. Specifically, count IV charged the defendant with felony murder predicated on the commission of the forcible felony of armed robbery. Counts V-VIII were identical to counts I-IV but named the victim as Wyatt Bailey. Count IX charged the defendant with armed robbery (*id.* § 18-2(a)(2)), and count X charged him with robbery (*id.* § 18-1(a)).

¶ 23                                   B. Jury Selection

¶ 24 On July 18, 2022, jury selection began. Prior to the prospective jurors entering the courtroom, the State dismissed counts I-III of the indictment and elected to proceed on the remaining counts. The trial court questioned prospective jurors in panels of 14. Juror Latwaun Cross was questioned as part of the first panel and stated he was 48 years old and lived in Danville, Illinois. The trial court's introductory questions to Juror Cross and his responses were as follows:

> "[Q]: All right. Are you married?
> [A]: Yes.
> [Q]: Where are you employed at?
> [A]: Danville Metal Stamping.
> [Q]: How long have you been there?
> [A]: 15 years.

12

[Q]: Your wife?
[A]: Employed.
[Q]: Where?
[A]: OSF here in Danville.
[Q]: Do you have children?
[A]: Yes, five.
[Q]: How old are they? How old is your oldest?
[A]: Oldest is, like, 34?
[Q]: Employed?
[A]: He live in Oklahoma. I don't know where he work at.
[Q]: Next one?
[A]: The next one, she live in Dallas, Texas. She 34.
[Q]: Do you know if she's employed?
[A]: No.
[Q]: Next one?
[A]: 33, from Iowa. I don't know where she work at either.
[Q]: Okay.
[A]: I got a 30 year old, Urbana, and I don't know where she work either.
[Q]: All right. Last one?
[A]: 19 from Danville. She work at Burger King."

¶ 25    The trial court then asked the panel of jurors whether they had heard or read anything about the case before today. Juror Cross raised his hand and said he had heard "[a] few things, a couple things," and he "actually work[s] with Natasha Bailey," who was the mother of victim Wyatt Bailey. He stated he had not formed any opinions and could be fair and impartial. When the trial court asked whether anyone knew any of the witnesses on the list, Juror Cross again indicated that he knew Natasha Bailey. Juror Cross stated that he had worked with her for about "four or five years," but she was not "a close friend." Juror Cross also indicated he knew Jason Hicks, the boyfriend of Natasha Bailey, from work, but could remain fair and impartial.

¶ 26    During the State's opportunity to question the group of jurors, the State asked, "Have any—you or any family member or close friend ever been charged with a crime?" Several jurors raised their hands and discussed family members who had been previously or were currently charged with a crime. Juror Cross did not raise his hand or otherwise indicate a response to the State's question. The State also asked if anyone knew the victims, Clayvonte Sloan or Wyatt Bailey. Juror

13

Cross indicated he knew Wyatt Bailey from work, because Bailey had also worked at the same place for a while. Juror Cross stated he was familiar with Bailey "just from work", and he could remain fair and impartial. After *voir dire* of the first panel was completed, neither the State nor the defense raised a for-cause challenge related to Juror Cross.

¶ 27    Subsequently, after *voir dire* of the second panel, the following exchange occurred:

> "MR. MCKAY [(ASSISTANT ATTORNEY GENERAL)]: Judge, I actually have one more thing. Just over lunch, I had been talking to a police officer just about the last panel, just what do you think of various jurors? And he did mention that one of them, Mr. Cross, actually had a number of criminal convictions in his past. I did look him up on Jano, so I'm a little concerned that he didn't volunteer that when asked if he, a family member or close friend had any criminal arrests or convictions in his past. So would actually make a motion to strike him for cause as a result of not being truthful with that. At least according to Jano, he had a number of them.
> MS. BEZNER [(DEFENSE COUNSEL)]: I think we'd like an opportunity to investigate that. I think it's really interesting that the Attorney General went to go investigate the only black juror that's been called so far.
> THE COURT: I think that's the only one the officers brought to his attention. But at this point, I'll just show we'll continue that request. We'll take—lets take a 15-minute break so you can take a look into that, if you want. If need be, we'll bring Mr. Cross back and you can question him.
> MR. MCKAY: Judge, with that, we had sent the entire witness—the entire potential jury list to various officers that we know from past cases with the Danville Police Department. And so this was—when we're inquiring about this, I just want to make the record that we didn't just—we weren't just picking out a single person. We had sent the entire list to one of the detectives over there. So that's what that was."

The trial court continued the request and took a short recess.

¶ 28    After the recess, the trial court revisited the State's concern regarding Juror Cross. The parties agreed that Juror Cross had been charged with four misdemeanors in 1997, 1998, 2003, and 2004 that had been dismissed, and a 1998 DUI conviction after a plea. The State believed that included in the four misdemeanors was a domestic battery, which resulted in a not guilty after trial, and an "order of protection, domestic that was dismissed." The State believed the Juror Cross's lack of response to its question was "not accurate." The trial court stated it did not view the criminal

14

history as being significant; however, Juror Cross did not answer the question. Thus, the trial court opted to question Juror Cross and give him an opportunity to explain.

¶ 29    Later, Juror Cross was brought into the courtroom for additional questioning. The following exchange occurred between the trial court and Juror Cross:

"THE COURT: Mr. Cross, if you could just have a seat in the jury box. We've got to ask you a couple follow-up questions. First off, you didn't do anything wrong. I think we did a poor job of asking you a couple questions, okay? So when we were going over the potential jurors, there were some questions to your answers to a couple of questions. All right? One of the questions was asked regarding to all the jurors, have you ever been charged with any type of a criminal offense before? Have you ever been charged with a criminal offense?

JUROR CROSS: Yes, I have. I caught a DUI about 20 years ago.

THE COURT: All right. Anything else?

JUROR CROSS: Not that I was convicted of.

THE COURT: Well that's why we're asking—anything you were charged with?

JUROR CROSS: A domestic, domestic case.

THE COURT: Approximately how long ago was that?

JUROR CROSS: Probably about 25 years ago.

THE COURT: All right. Both of those cases, or all of those cases were here in Vermilion County?

JUROR CROSS: Yeah.

THE COURT: All right. Anything about how you were treated in those cases that would affect your ability to be fair and impartial?

JUROR CROSS: No.

THE COURT: You—I think you said that in the domestic cases, those were dropped, or did you go to trial, or what happened?

JUROR CROSS: I did go to trial.

THE COURT: Okay. You went to trial and you were acquitted on one?

JUROR CROSS: Yeah.

THE COURT: All right. And then what happened to the DUI case?

JUROR CROSS: I pled guilty.

THE COURT: All right. That's all been resolved years ago?

JUROR CROSS: Yeah, many years ago.

THE COURT: I think we asked you, I know we asked you if you knew [the defendant]. You didn't know [him]?

JUROR CROSS: No.

THE COURT: Do you know any of his family?

JUROR CROSS: I think I do. If that's the ones in the back of the courtroom, I know a couple of those.

THE COURT: Okay. All right. Are they people you socialize with, or you just know them to say hello to?

JUROR CROSS: Just know them from being around.

15

> THE COURT: All right. Anything about that relationship with them that would affect your ability to be fair and impartial?
>
> JUROR CROSS: No.
>
> THE COURT: All right. Who is it that you think that you know that's in his family?
>
> JUROR CROSS: I couldn't even call them by name. I really don't know.
>
> THE COURT: Just people you see, you run into?
>
> JUROR CROSS: Yeah."

The trial court then released Juror Cross from the courtroom, and the State withdrew its for-cause challenge for Juror Cross.

¶ 30 When Juror Cross was tendered as part of the jury panel, the State exercised its first peremptory strike. The State additionally moved to strike another juror, Ms. Berry, as part of the panel. The defense raised a *Batson* challenge as to the strike of Juror Cross. The trial court reserved the Batson challenge until the end of jury selection. The State exercised three more peremptory strikes on Ms. Coombs, Ms. Martinez, and, as to an alternate juror, Ms. Koch.

¶ 31 The trial court then considered the defendant's *Batson* challenge. Defense counsel argued, "Mr. Cross is the only black person in the first 40 jurors. He's the only black person that the State struck. My client is black. He said absolutely nothing indicating he could not be fair and impartial. There is no race-neutral reason for striking him. They struck him because he's black." Counsel further noted that the State had struck a potential juror with a Hispanic last name who may also have been a member of a minority group.

¶ 32 The trial court found a *prima facie* showing with respect to Juror Cross and asked the State to provide its race-neutral rationales. The State responded there were

> "[m]ultiple reasons why we don't like Mr. Cross. First, he does have a criminal record. It might have been a while ago, but he does, nonetheless, have one.
>
> Also, maybe it's a result of him being confused by the questions, or maybe not. I don't, quite frankly, trust that. If it was a white juror, a Hispanic juror, and [*sic*] Asian juror, anybody, that's going to be raising huge red flags.
>
> Also, he was a person with five kids and he says he doesn't know what four of them do. That's just weird and strange, and quite frankly, I don't want someone weird and strange on my jury.

16

These are all race-neutral reasons, and also, he knows, apparently, [the defendant's] family. He is not friends with them, but he's nonetheless familiar with them. These are numerous rate-neutral [*sic*] reasons why we wouldn't want Mr. Cross. Quite frankly, he knows the victim, and the victim's mom, and he [*sic*] victim's stepdad, Mr. Hicks. I don't know what his opinions are. He says that, you know, it wouldn't affect him, but that's also a wild card. It's too many wild cards on a single person that we have no interest in. These are all race-neutral reasons. It has nothing to do with his race whatsoever."

The defense argued that there were multiple other jurors who did not know their children's occupation and knew people on the witness list.

¶ 33 The trial court denied the defendant's *Batson* challenge, noting that Juror Cross "did know the family of the victims, family of the [d]efendant," and his familiarity with so many people involved in the case was a valid race-neutral reason for excusing him. Additionally, the trial court observed that it had excused another prospective juror for cause on a similar basis.

¶ 34                                    C. Trial Testimony

¶ 35 The jury trial began on July 19, 2022. At trial, the State presented testimony from multiple witnesses regarding the events of January 17, 2021, in Oakwood, Illinois. No witness testified to having directly observed the shootings. Evidence showed that the defendant contacted Wyatt Bailey through Snapchat to arrange a marijuana purchase. Messages reflected that the defendant planned to purchase marijuana and marijuana related products (cartridges), and Bailey provided his address. Bailey gathered cannabis products into a black bag, recorded a video of the items and sent it to the defendant via Snapchat, and exited his residence carrying the bag. Bailey also had his firearm, a Glock handgun, in his sweatshirt pocket.

¶ 36 Shortly thereafter, multiple witnesses heard gunshots. Several individuals testified that they observed a gold Chevrolet Impala in the area before and after the gunshots, including driving through the neighborhood and then leaving at a high rate of speed. One witness observed a person enter the rear passenger-side door of the vehicle as it drove away, and others described the rear

passenger-side door as open while the vehicle was in motion. No witness identified any occupant of the vehicle or testified to observing anyone shoot Bailey.

¶ 37 Bailey was found lying on his back outside his residence with gunshot wounds. Testimony described injuries to his chest, legs, and hip, as well as blunt force trauma to the back of his head consistent with being struck. Evidence showed that items Bailey had taken outside, including the cannabis bag, were no longer on his person, and the front pocket of his hoodie, where his firearm was located, was ripped.

¶ 38 Witness testimony also addressed events near a ravine at the end of the street. After hearing gunshots, a witness observed the Impala pull up in that area and saw an arm with African-American skin extend from the front passenger-side window and throw a firearm into the nearby wooded ravine. Additional evidence included video footage from that area depicting the vehicle turning around, with the rear passenger-side window lowered. Law enforcement later recovered a Smith & Wesson 9-millimeter handgun from that location. Firearms examination established that this weapon fired the shell casings recovered from the scene, as well as the fired bullet recovered from the ground near where Bailey was shot. In addition, the bullet removed from Bailey's leg during autopsy was determined to have been fired from that same Smith & Wesson. DNA testing further identified Bailey's DNA on the trigger of the firearm and Clayvonte Sloan's DNA on the barrel.

¶ 39 Law enforcement stopped the Impala shortly after the shooting. The vehicle contained five occupants, including the defendant, who was seated in the rear passenger-side seat. Clayvonte Sloan was found unresponsive in the backseat between the rear passengers. Testimony described the occupants as "scared" and "frantic," and the defendant was observed shaking Sloan and stating that someone in the vehicle had been shot. Sloan later died from a gunshot wound that entered his lower abdomen and exited through his body, causing significant internal bleeding.

18

¶ 40    Officers recovered two firearms from the rear seating area of the Impala, including a Glock handgun associated with Bailey; testimony indicated that the firearms recovered from the vehicle were inoperable at the time due to malfunctions. A fired bullet associated with the Glock was located lodged in the rear bench seat in the area where Sloan had been seated. Officers also recovered a black bag containing cannabis products from beneath the front passenger seat. Testimony indicated that the contents of that bag were consistent with the cannabis products depicted in the Snapchat video recorded by Bailey shortly before the shooting. In addition, approximately $1,000 in currency was recovered from the vehicle, consisting of both U.S. currency and counterfeit bills.

¶ 41    Gunshot residue (GSR) samples were collected from the occupants of the vehicle, including the defendant, as well as from portions of the vehicle's interior. Forensic scientist Shan Mei-Jones testified that primer GSR consists of particles containing lead, barium, and antimony, and that a positive result requires the confirmed presence of at least three tri-component particles. The defendant tested positive on both hands. Griggs tested positive on both hands, and Bryant tested positive on his right hand only, while Halthon's samples were negative. Mei-Jones noted that the samples were collected more than six hours after the shooting, which could have reduced the number of detectable particles, yet the presence of GSR on the defendant's hands remained significant. She also identified GSR on portions of the vehicle's interior, including areas near the door panel, consistent with the discharge of a firearm within or in close proximity to the vehicle. Mei-Jones explained that such residues may result from firing, handling, or being near a discharged firearm, and that particles can transfer between individuals and surfaces.

¶ 42    The defense presented testimony from one witness, who testified that photographs recovered from Bryant's phone depicted him with a firearm prior to the incident. During

deliberations, the jury requested a definition of "proximately," and the court instructed the jury that the term meant "[i]mmediately by or after, very near, or close in time."

¶ 43    The jury found defendant guilty of armed robbery and two counts of first degree murder for the deaths of Wyatt Bailey and Clayvonte Sloan. The jury further found that the defendant personally discharged a firearm that proximately caused great bodily harm or death to Bailey.

¶ 44                          D. Post-Trial and Sentencing

¶ 45    On October 3, 2022, the trial court first held a hearing on the defendant's amended motion for acquittal or a new trial. The defendant's amended motion raised several arguments, including an as-applied constitutional challenge to the sentence because the mandatory minimum 40 year sentence "leaves no discretion to the judge to craft an individualized sentences as required by *Miller v. Alabama*, 567 U.S. 460 (2012), *People v. Buffer*, 2019 IL 122327 (2019), and 730 ILCS 5/5-4.5-105." Additionally, in a separate sentencing memorandum filed October 3, 2022, the defendant argued that, in order to comply with *Buffer*, the trial court must sentence him to less than 40 years imprisonment; thus, the 40-year mandatory minimum the defendant faces is unconstitutional as applied, because it prevents the trial court from considering the required factors under *Miller* and section 5-4.5-105 of the Unified Code of Corrections (730 ILCS 5/5-4.5-105 (West 2020)). At the hearing on the amended motion, defense counsel made several arguments in support of acquittal or a new trial. However, in regard to the as-applied constitutional challenge to the sentencing range, defense counsel did not make an argument but instead opted to "take that up separately." The State did not address that claim in its responsive arguments. The trial court, when denying the defendant's amended motion, stated, "As far as the minimum sentence being 40 years, that's been the law in the State for some time. I'm sure it's been challenged many times. You're

20

welcome to challenge it again on appeal, but at this point in time, I'm not going to find that was unconstitutional."

¶ 46 After denying the defendant's amended motion, the trial court then proceeded to sentencing. The State presented testimony from Logan Ingram, the probation officer who created the presentence investigation report for the defendant, and Danville Police Officer Seth Talbot, who recounted prior encounters with the defendant in 2020. Kathy Cooper, the grandmother of victim Wyatt Bailey, provided a victim impact statement. The State argued in aggravation that the defendant had demonstrated a lack of regard for human life, emphasizing the circumstances of the offense, the defendant's prior delinquency adjudication, and his supervision status at the time of the shootings.

¶ 47 Defense counsel argued in mitigation, highlighting Cooper's age and immaturity—he had turned 15 just 11 days before the incident—his positive conduct while in juvenile detention, his responsiveness to adult guidance, his traumatic childhood, and vulnerability to peer influence. Counsel emphasized the prior findings of Dr. Hoy-Watkins contained in the psychological evaluation report that was completed for the purposes of the transfer hearing. She noted the defendant's emotional maturation was underdeveloped, that his upbringing, including repeated paternal incarceration, increased his susceptibility to peer influence, and that he had displayed rehabilitation, including positive school performance and behavior while detained. A letter from the mother of the second victim, Clayvonte Sloan, was read, indicating she did not wish the defendant to serve time for her son's death.

¶ 48 The trial court, considering the defendant's youth and the mitigating evidence presented, imposed the mandatory minimum sentence of 20 years' imprisonment on each count of first degree murder, to be served consecutively, for an aggregate sentence of 40 years. The trial court merged

21

the armed robbery conviction into the felony murder conviction and declined to apply a firearm-enhancement for Bailey's death, although it agreed that the evidence supported the jury's finding of personal discharge. The court noted it had the ability to sentence the defendant to more than 40 years, but after considering the defendant's youth and attendant circumstances, it declined to impose a sentence in excess of the minimum. Specifically, the trial court stated,

> "The request for 70 years from the State, had he been 18 years old, was a [*sic*] perfectly reasonable, and in fact, probably low. It would have been mandatory life. You earned every bit of 70. I'm only giving you 40 because the case law tells me I have to find extraordinary circumstances, and they are just not here."

On April 24, 2023, at the hearing on the motion to reconsider the sentence, defense counsel stood on her written motion. The motion to reconsider the sentence was subsequently denied. This appeal followed. Additional facts are included in the analysis section where necessary.

¶ 49                                   II. ANALYSIS

¶ 50                           A. Discretionary Transfer

¶ 51    On appeal, the defendant first contends that the juvenile court abused its discretion in transferring him to adult criminal court by (1) misinterpreting his traumatic experiences as maturity, (2) failing to accurately account for expert evidence of his emotional underdevelopment and susceptibility to peer influence, (3) overemphasizing the seriousness of the offense, and (4) failing to consider the availability and potential effectiveness of rehabilitative services in the juvenile system. He contends that, in light of his age, minimal delinquency history, and capacity for rehabilitation, he should have remained in juvenile court.

¶ 52    The State argues the juvenile court did not abuse its discretion in transferring the defendant to adult court. The juvenile court properly considered all statutory factors, including the

defendant's age, history, circumstances of the offense, and public safety. The offenses involved the death of two victims with a firearm, and the defendant had a prior history of delinquency and school disciplinary issues. The juvenile court also found that juvenile services could still be accessed if transferred. The State highlights that the defendant's arguments merely dispute the weight the juvenile court assigned to these factors, which is insufficient to overturn a transfer under the highly deferential abuse of discretion standard.

¶ 53    Whether a case was properly transferred to adult court is reviewed for an abuse of discretion. *People v. Clark*, 119 Ill. 2d 1, 18 (1987). However, that discretion is limited and controlled by the Act. *People v. Moore*, 2011 IL App (3d) 090993, ¶ 21. Courts of review must determine if there was sufficient evidence in the record as to each statutory factor to support the transfer order. *Id.* "The mere recitation in the record that all statutory factors have been considered is not enough to affirm a discretionary transfer order." *Id.* In determining whether to transfer a juvenile, the court must consider:

"(i) the age of the minor;

(ii) the history of the minor, including:

(A) any previous delinquent or criminal history of the minor,

(B) any previous abuse of neglect history of the minor, and

(C) any mental health, physical or educational history of the minor or combination of these factors;

(iii) the circumstances of the offense, including:

(A) the seriousness of the offense,

(B) whether the minor is charged through accountability,

23

(C) whether there is evidence the offense was committed in an aggressive and premeditated manner,

(D) whether there is evidence the offense caused serious bodily harm,

(E) whether there is evidence the minor possessed a deadly weapon;

(iv) the advantages of treatment within the juvenile justice system including whether there are facilities or programs, or both, particularly available in the juvenile system;

(v) whether the security of the public requires sentencing under Chapter V of the Unified Code of Corrections:

(A) the minor's history of services, including the minor's willingness to participate meaningfully in available services;

(B) whether there is a reasonable likelihood that the minor can be rehabilitated before the expiration of the juvenile court's jurisdiction;

(C) the adequacy of the punishment or services.

In considering these factors, the court shall give greater weight to the seriousness of the alleged offense and the minor's prior record of delinquency than to the other factors listed in this subsection." 705 ILCS 405/5-805(3)(b) (West 2020).

In addition to those statutory factors, the court must also weigh nonstatutory factors when making its decision, "such as the resulting sentence if the minor is convicted under the Criminal Code." *Moore*, 2011 IL App (3d) 090993, ¶ 20. When reviewing a juvenile court's order transferring a minor, a reviewing court does not reweigh the factors. *People v. Harris*, 2022 IL App (1st) 192509, ¶ 22.

¶ 54    Based on a thorough review of the record, the juvenile court did not abuse its discretion in granting the State's motion to transfer the defendant for prosecution under the criminal laws. The

24

juvenile court conducted a full evidentiary hearing, heard arguments from counsel, and found probable cause that the defendant committed the acts alleged, which included multiple counts of first degree murder. Further, the juvenile court took under advisement whether it was in the best interests of the public to proceed under the Act, requested counsel to submit final arguments in writing, and explicitly considered all statutory factors enumerated in section 5-805(3)(b) of the Act (705 ILCS 405/5-805(3)(b) (West 2020)) and nonstatutory factors. The juvenile court's decision reflects a careful balancing of the defendant's potential for rehabilitation against the public's interest in protection from serious criminal conduct.

¶ 55　First, regarding the defendant's age, the juvenile court noted that he had just turned 15 at the time of the offenses. While acknowledging the emotional, intellectual, and social characteristics inherent to youth, the juvenile court found that the defendant's life experiences— including prior encounters with law enforcement, having shots fired at him at ages 10 and 14, and prior supervision for a gun and drug related armed robbery—reflected exposure beyond his chronological years. Although expert testimony described his emotional maturity as underdeveloped and tenuous, the juvenile court found that the defendant demonstrated leadership in planning the drug transaction and bringing other young individuals into the criminal scheme, indicating he was a leader rather than a follower.

¶ 56　Second, in evaluating the defendant's history, the juvenile court emphasized his prior delinquency, including a two-year period of juvenile supervision for an armed robbery with guns, school disciplinary actions, and violations of prior supervision—including having contact with the other codefendants related to this case. The juvenile court also considered prior trauma, including the incarcerations of his father and experiences with gun violence, but found no evidence of abuse

25

or neglect requiring child protection intervention. The juvenile court concluded that prior interventions—judicial, school, or otherwise—had failed to alter the defendant's behavior.

¶ 57   Third, regarding the circumstances of the offenses, the juvenile court found the defendant was facing the most serious of offenses and was charged as both a principal and through accountability. Additionally, it determined there was evidence that the defendant planned the underlying drug transaction and personally joined in the physical assault upon the victim, Bailey, which demonstrated aggression and premeditation. Further, there was evidence that the offenses caused the death of two victims, and the defendant possessed a firearm. These findings are consistent with the statutory factors for discretionary transfer.

¶ 58   Fourth, the juvenile court considered the advantages of treatment in the juvenile justice system. It acknowledged that rehabilitation programs exist and would remain available until age 21, regardless of whether the defendant was prosecuted as an adult. However, the defendant had never participated in such programs and had previously minimized the need for substance abuse or other interventions. The juvenile court concluded that while juvenile programming might benefit him, his escalating aggressive conduct and lack of engagement with prior interventions suggested a limited likelihood of rehabilitation before the expiration of juvenile court jurisdiction.

¶ 59   Finally, the juvenile court considered the public safety and adequacy of punishment factors. The defendant's violations of supervision, history of disciplinary issues, and continued engagement in criminal behavior demonstrated a pattern of escalating "aggression, hostility, and rejection of authority and discipline." The juvenile court found that a juvenile sentence of five years would inadequately reflect the gravity of the offenses or protect the public. Additionally, it also explicitly considered the potential adult sentence if the defendant were convicted under the criminal laws, noting that "if the minor were convicted of murder in criminal court he would serve

a minimum of 20 years in prison." In weighing the statutory factors, the juvenile court properly gave greater weight to the seriousness of the offenses and the defendant's prior delinquency, as required by statute.

¶ 60    Although the defendant argues that the court erred in considering certain factors or that it should have assigned more weight to mitigating circumstances such as his age or influence from older codefendants, such arguments merely challenge the weight given to the factors. Under established Illinois law, a reviewing court will not substitute its judgment for that of the juvenile court or reverse a transfer order simply because it might have weighed the factors differently. *People v. Morgan*, 197 Ill. 2d 404, 428 (2001).

¶ 61    Accordingly, the juvenile court carefully considered all required factors, properly weighed the seriousness of the offense and the defendant's prior history, balanced the defendant's rehabilitative potential against public safety, and reached a reasoned conclusion that transfer to adult court was warranted. Because the defendant's arguments amount to a disagreement with the weight assigned to those factors, we find the juvenile court acted within its discretion in transferring the defendant.

¶ 62                              B. *Batson* Challenge

¶ 63    The defendant next contends that the trial court erred in denying his challenge under *Batson v. Kentucky*, 476 U.S. 79 (1986), to the State's peremptory strike of Juror Cross, the only African-American prospective juror, arguing that the State's proffered reasons were pretextual and unsupported by the record. Under *Batson*, a three-step process governs such claims: (1) the defendant must first make a *prima facie* showing of discrimination, (2) if that showing is made, the burden shifts to the State to articulate a race-neutral explanation for the strike, and (3) the trial court must then determine whether the defendant has established purposeful discrimination.

27

*Batson*, 476 U.S. at 96-98; *People v. Easley*, 192 Ill. 2d 307, 323-24 (2000). At the second step, the State's burden is minimal and requires only a facially race-neutral reason. *Purkett v. Elem*, 514 U.S. 765, 768 (1995). The ultimate question of discriminatory intent at the third step is a factual determination, and a reviewing court will not disturb that finding unless it is clearly erroneous. *People v. Harris*, 206 Ill. 2d 1, 17 (2002). "Where more than one explanation has been offered for the exclusion of a venire member, it is sufficient for our purposes if at least one of these explanations is race neutral." *Id.*

¶ 64    Here, after finding that the defendant made a *prima facie* showing, the trial court required the State to articulate its reasons for striking Juror Cross. The State identified several concerns, including Cross's apparent lack of candor regarding his prior criminal history, his inability to specify the occupations of most of his adult children, and his familiarity with both the defendant's family and the victim's family, which the State characterized as rendering him a "wild card." The trial court denied the *Batson* challenge, relying in part on Cross's familiarity with individuals connected to both sides of the case. The defendant argues that these reasons were pretextual, emphasizing that other prospective jurors exhibited similar characteristics but were not struck and that the State misstated portions of Cross's *voir dire* testimony. The State responds that its concerns were supported by the record and that Cross's combination of characteristics distinguished him from other prospective jurors.

¶ 65    In denying the defendant's posttrial motion on this issue, the trial court further explained its reasoning, noting its understanding that the State had conducted background checks on all prospective jurors, not solely Cross, and reiterating that Cross had acknowledged knowing the victim and his mother, as well as having some familiarity with defendant's family. The trial court analogized this circumstance to its removal of another juror for cause based on concerns about

28

potential influence arising from familiarity, and emphasized that, under *Batson*, the State was required only to provide a race-neutral reason for the strike, not one the court itself would necessarily have exercised.

¶ 66     On this record, we cannot say that the trial court's determination was clearly erroneous. The State's proffered reasons were facially race-neutral, and Cross's acknowledged familiarity with both the victim's and the defendant's families, some of whom were testifying witnesses, finds support in the record and provides a rational, case-related basis for the strike. See *People v. Britt*, 265 Ill. App. 3d 129, 137-38 (1994) (the State's concerns regarding a juror's acquaintance with potential witnesses are legitimate, race-neutral reasons for exercising a peremptory challenge). Although the defendant points to other jurors who also had some familiarity with individuals connected to the case or were unable to identify their adult children's occupations, the record reflects that those jurors did not present the same combination of concerns identified by the State— particularly Cross's familiarity with both the victim's and defendant's families. Moreover, the trial court was in the best position to evaluate the prosecutor's credibility and the juror's demeanor, and its determination is therefore entitled to substantial deference. *Flowers v. Mississippi*, 588 U.S. 284, 303 (2019). Given the deference owed to the trial court's credibility determinations and the support in the record for the State's race-neutral explanations, we cannot say the trial court's ruling was clearly erroneous. Accordingly, the trial court did not err in denying the defendant's *Batson* challenge.

¶ 67                                         C. Felony Murder Conviction

¶ 68     The defendant next argues that his conviction for first degree murder in the death of Clayvonte Sloan must be vacated because (1) the version of the felony murder statute in effect at

29

the time of the offense was unconstitutional as applied to him and (2) the evidence was insufficient to establish that he proximately caused Sloan's death.

¶ 69    As to the defendant's constitutional challenge, the constitutionality of a statute is a question of law subject to *de novo* review. *People v. Gray*, 2017 IL 120958, ¶ 57. Statutes are presumed constitutional, and the party challenging a statute bears the burden of clearly establishing a constitutional violation. *Id.* A court must construe a statute so as to uphold its constitutionality if reasonably possible. *Id.* Further, "neither the fourteenth amendment nor the Illinois Constitution prevents statutes and statutory changes from having a beginning," and the legislature may enact changes prospectively without offending due process. *People v. Richardson*, 2015 IL 118255, ¶ 10; see also *People v. Brown*, 2024 IL 129585, ¶¶ 30-37 (holding provisions of Public Act 101-652 apply prospectively).

¶ 70    Under the version of the felony murder statute in effect at the time of the offense, a defendant commits first degree murder if, in performing the acts which cause a death, he is committing or attempting to commit a forcible felony. 720 ILCS 5/9-1(a)(3) (West 2020). At the time, Illinois followed the proximate cause theory of felony murder, under which liability attached for any death proximately resulting from the commission of a forcible felony, "notwithstanding the fact that the killing was by one resisting the crime." *People v. Dekens*, 182 Ill. 2d 247, 249 (1998); *People v. Lowery*, 178 Ill. 2d 462, 465 (1997). The Illinois Supreme Court has rejected challenges to the proximate cause theory as it then applied to felony murder and reaffirmed its application, including in cases involving the death of a co-felon. *People v. Klebanowski*, 221 Ill. 2d 538, 554-55 (2006).

¶ 71    The defendant acknowledges that the statutory amendment narrowing felony murder liability does not apply retroactively but argues that its enactment renders the prior version

30

unconstitutional as applied to him based on (1) the proximal timing of the amendment to the offense and (2) his youth and the fact that Sloan was killed by a third party. The State responds that the defendant had no due process right to the retroactive application of the amended statute and that existing precedent forecloses his constitutional claim.

¶ 72    The defendant frames his claim as an as-applied constitutional challenge based on his individual youth, cognitive development, and personal circumstances. Such claims ordinarily require a sufficiently developed factual record. *People v. Thompson*, 2015 IL 118151, ¶ 37. Although the record here contains information concerning the defendant's youth and background, including a psychological evaluation prepared in connection with the juvenile transfer proceedings, it was not developed in the trial court for the purpose of litigating an as-applied constitutional challenge to the felony murder statute. Nor was such an argument even raised by counsel before the trial court.

¶ 73    If we found the defendant's claim potentially meritorious, we would decline to consider it on this record. See *People v. Harris*, 2018 IL 121932, ¶¶ 38-39. However, for the reasons discussed below, we find the defendant's challenge fails as a matter of law, even accepting the defendant's premise that his youth and attendant circumstances diminish his culpability. Accordingly, there is no need to delay resolving this issue. See *People v. Watson*, 2021 IL App (1st) 180034, ¶ 20.

¶ 74    On the merits, the defendant's claim fails. The legislature's decision to amend the statute prospectively does not render the prior version unconstitutional, even where, as here, the amendment occurred in close temporal proximity to the commission of the offense. *Brown*, 2024 IL 129585, ¶¶ 30-37; *Richardson*, 2015 IL 118255, ¶ 10. As our supreme court has made clear, the legislature may choose to change the law prospectively without offending constitutional principles, and such changes do not undermine the validity of the prior statutory scheme. *Id*. Thus,

31

the timing of the amendment does not alter the analysis or provide a basis for concluding that the statute, as previously written, is unconstitutional as applied to the defendant.

¶ 75     Moreover, binding precedent has upheld the proximate cause theory as it then applied to felony murder, including where the fatal act was committed by a third party. *Klebanowski*, 221 Ill. 2d at 554-55. Illinois courts have likewise rejected similar attempts to invalidate the statute based on a defendant's youth or evolving juvenile jurisprudence. See, *e.g.*, *Watson*, 2021 IL App (1st) 180034, ¶¶ 49-52, 57; *People v. O'Neal*, 2021 IL App (4th) 200014, ¶ 64-66. These decisions decline to extend juvenile sentencing jurisprudence to invalidate the felony murder statute on due process grounds, recognizing that such principles do not alter the substantive scope of liability under the statute.

¶ 76     Accordingly, even accepting the defendant's premise regarding his youth and attendant circumstances, he has not established that the felony murder statute, as applied to him, violates due process. Thus, the defendant has failed to meet his burden of clearly establishing a constitutional violation, and his challenge to the statute fails.

¶ 77     The defendant next argues that the evidence was insufficient to prove felony murder beyond a reasonable doubt. When a defendant makes a claim that there was insufficient evidence to sustain his conviction, this court reviews the evidence presented at trial in the light most favorable to the prosecution to determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime or crimes of which the defendant was convicted. *People v. Saxon*, 374 Ill. App. 3d 409, 416 (2007). We will not reverse a criminal conviction unless the evidence presented at trial is so improbable or unsatisfactory as to justify a reasonable doubt as to the guilt of the defendant. *Id.* We allow all reasonable inferences from the record in favor of the prosecution, whether the evidence in the case is direct or circumstantial. *Id.*

32

There is no requirement that this court disregard inferences that flow from the evidence, or that this court search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. *Id.* at 416-17. We do not retry the defendant; instead, leaving it to the trier of fact to judge the credibility of witnesses, resolve conflicts in the evidence, and draw reasonable inferences based upon all of the evidence properly before the trier of fact. *Id.* at 416.

¶ 78    To sustain a conviction for felony murder, the State was required to prove that the defendant committed or attempted to commit a forcible felony and that Sloan's death was proximately caused by that felony. 720 ILCS 5/9-1(a)(3) (West 2020); *People v. Hudson*, 222 Ill. 2d 392, 401 (2006). Although foreseeability is not an element of felony murder where the killing is committed by a co-offender, it is required under Illinois's proximate cause theory where, as here, the fatal act is committed by a third party. See *Lowery*, 178 Ill. 2d at 465-66. Proximate cause includes both cause in fact and legal cause, the latter of which is essentially a question of foreseeability—whether the resulting harm is of a type that a reasonable person would see as a likely consequence of his conduct. *Id.*

¶ 79    Viewing the evidence in the light most favorable to the State, a rational jury could find that the defendant participated in an armed robbery and that Sloan's death was a direct and foreseeable consequence of that offense. The evidence showed that the defendant arranged the meeting with the victim, Bailey, for a marijuana transaction, arrived with multiple companions and firearms, and the victim suffered injuries to the back of the head and fatal gunshot wounds from the firearm that was discarded from the Impala into a nearby ravine. Further, following the incident, the group possessed the victim's bag of marijuana, both legitimate and counterfeit currency, and a firearm belonging to the victim. Additionally, the defendant tested positive for gunshot residue on both of his hands. From this evidence, the jury could reasonably infer that the defendant intended to take

33

property by force. See *People v. Jones*, 376 Ill. App. 3d 372, 387 (2007) (felony murder derives its mental state from the underlying felony).

¶ 80    The jury could likewise find proximate cause. Illinois courts have consistently held that it is reasonably foreseeable that a victim of a forcible felony will resist with deadly force, and that such resistance may result in the death of a participant. *Dekens*, 182 Ill. 2d at 249; *Lowery*, 178 Ill. 2d at 473. Here, the jury was properly instructed that it must find that Sloan's death was a "direct and foreseeable consequence" of the chain of events set in motion by the armed robbery. The evidence supported such a finding, as the circumstances—an arranged meeting involving multiple participants, firearms, and the taking of property—created a situation in which a violent response was a reasonably foreseeable consequence under an objective standard.

¶ 81    The defendant's argument that his youth rendered Sloan's death unforeseeable is unpersuasive. In making this claim, the defendant relies on principles from juvenile sentencing cases, which recognize that juveniles are generally less mature and less able to evaluate risks and foresee consequences than adults. See, *e.g.*, *Miller*, 567 U.S. at 471-72. Based on that, the defendant argues that foreseeability should be judged from the perspective of a reasonable juvenile rather than a reasonable person. As discussed above, Illinois felony murder liability does not turn on a defendant's subjective ability to anticipate the precise manner in which a death occurs, but instead applies an objective standard tied to the foreseeable consequences of the underlying felony. See *Hudson*, 222 Ill. 2d at 401. The defendant's reliance on juvenile sentencing jurisprudence is misplaced, as those principles do not alter the substantive elements of felony murder or the objective reasonable-person standard governing proximate cause. See *Watson*, 2021 IL App (1st) 180034, ¶¶ 40-43, 52. Because the law does not adjust foreseeability based on the offender's youth, the jury was entitled to apply the objective standard, and we will not disturb its finding on appeal.

34

¶ 82    Accordingly, the defendant has not demonstrated that the felony murder statute was unconstitutional as applied to him, and the evidence, viewed in the light most favorable to the State, was sufficient to establish beyond a reasonable doubt that Sloan's death was proximately caused by the defendant's commission of armed robbery. Therefore, we affirm the defendant's conviction on this count.

¶ 83                              D. Sentencing

¶ 84    Lastly, the defendant contends that his aggregate 40-year sentence, imposed as two mandatory consecutive 20-year terms for first degree murder, violates the eighth amendment and the proportionate penalties clause of the Illinois Constitution as applied to him. He argues that the mandatory nature of the sentencing scheme precluded meaningful consideration of his youth, rendering the sentence unconstitutional.

¶ 85    An as-applied constitutional challenge is a legal question that we review *de novo*. *People v. House*, 2021 IL 125124, ¶ 18. The eighth amendment prohibits cruel and unusual punishment and, under *Miller*, 567 U.S. at 479, forbids mandatory life-without-parole sentences for juvenile offenders, requiring that sentencing courts consider the mitigating qualities of youth before imposing the harshest penalties. The Supreme Court subsequently clarified that discretionary sentencing schemes satisfy this requirement so long as the sentencer considers an offender's youth and attendant circumstances before imposing a life-without-parole sentence. *Jones v. Mississippi*, 593 U.S. 98, 106 (2021). Under Illinois law, a prison term greater than 40 years imposed on a juvenile constitutes a *de facto* life sentence that triggers *Miller* protections. *People v. Buffer*, 2019 IL 122327, ¶¶ 41-42. Sentences of 40 years or less, by contrast, do not constitute *de facto* life sentences. *Id.* Moreover, the proportionate penalties clause (Ill. Const. 1970, art. I, § 11) is violated only where a penalty is cruel, degrading, or so wholly disproportionate to the offense as to shock

35

the moral sense of the community. *People v. Clark*, 2023 IL 127273, ¶ 51. Successful as-applied challenges to mandatory sentences remain rare. *People v. Hilliard*, 2023 IL 128186, ¶ 33.

¶ 86    The defendant argues that, because the trial court was required to impose a 40-year minimum, it lacked discretion to impose a lesser sentence even if his youth and attendant characteristics warranted mitigation. He maintains that this constraint rendered the sentence unconstitutional under both the eighth amendment and the proportionate penalties clause. The State responds that the sentence does not constitute a life or *de facto* life term, that the statutory scheme is constitutional, and that each 20-year term is proportionate to the seriousness of the offense

¶ 87    Here, the defendant's aggregate sentence is 40 years, which does not exceed the threshold established in *Buffer* and therefore does not constitute a *de facto* life sentence. *Buffer*, 2019 IL 122327, ¶¶ 41-42. Because *Miller*'s protections apply only to life or *de facto* life sentences, they are not implicated here. Further, the record indicates that the trial court considered the defendant's youth and attendant characteristics in imposing the 40-year sentence. Moreover, nothing in *Miller* or its progeny requires a sentencing court to have discretion to impose a sentence below a statutory minimum where the sentence imposed is not life or its functional equivalent. *Jones*, 593 U.S. at 104-05 (explaining that a discretionary sentencing scheme allowing the sentencer to consider youth and impose a lesser sentence than life without parole is constitutionally sufficient). Accordingly, because the defendant did not receive a life or *de facto* life sentence, his eighth amendment claim fails.

¶ 88    With respect to the defendant's proportionate penalties claim, we are presented with a different procedural posture. Unlike the eighth amendment, the proportionate penalties clause is not limited to life or *de facto* life sentences, and a defendant may raise an as-applied challenge to

a sentence of any length. *People v. Spencer*, 2025 IL 130015, ¶ 42-43. Further, evolving science regarding youth and brain development may, in an appropriate case, support such a claim. *Id.*

¶ 89    However, as our supreme court has repeatedly emphasized, as-applied constitutional challenges are dependent upon a sufficiently developed evidentiary record. *Id.* ¶ 44; *Harris*, 2018 IL 121932, ¶ 39. Where such a record has not been developed in the circuit court, the claim is more appropriately raised in a proceeding under the Post-Conviction Hearing Act. *Spencer*, 2025 IL 130015, ¶ 45; *Harris*, 2018 IL 121932, ¶ 48.

¶ 90    Although the record in this case contains more information regarding the defendant's youth and background than others, including a psychological evaluation prepared in connection with the juvenile transfer proceedings, the record was not developed for purposes of litigating an as-applied proportionate penalties challenge. The defendant raised the issue in a posttrial motion, but the trial court did not conduct an evidentiary hearing, receive testimony, or make factual findings directed toward how the defendant's specific characteristics render the mandatory sentencing scheme unconstitutional as applied to him. Thus, the record lacks the type of factual development contemplated in *Harris* and *Spencer*.

¶ 91    Accordingly, while the defendant is not foreclosed from pursuing his as-applied proportionate penalties claim, the present record is insufficient for this court to adjudicate that claim on direct appeal. The proper vehicle for such a challenge is a postconviction proceeding, commenced by the filing of a petition, which must, among other things, "clearly set forth the respects in which petitioner's constitutional rights were violated." 725 ILCS 5/122-2 (West 2020).

¶ 92    For these reasons, the defendant's eighth amendment challenge fails on the merits, and his proportionate penalties claim is better suited for postconviction review. The defendant's sentence is therefore affirmed.

¶ 93                              III. CONCLUSION

¶ 94    For the foregoing reasons, we affirm the defendant's convictions and sentence.


¶ 95    Affirmed.